HARTFORD NATIONAL BANK AND TRUST COMPANY
*v.* PAUL T. DIFAZIO ET AL.
(3120)

HULL, DALY and BIELUCH, Js.

Argued November 13, 1985—decision released March 25, 1986

*Robert L. Hirtle, Jr.,* for the appellants (defendants).

*Thelma A. Santos,* with whom were *Stephen R. Humphrey* and *Christine I. Andrew,* for the appellee (plaintiff).

BIELUCH, J. This appeal arises out of the second trial on the defendants' counterclaim against the plaintiff bank.[1] The defendants claim as error the trial judge's failure to recuse himself and a variety of subsequent evidentiary issues arising out of the retrial. We find no error.

The defendants, Paul T. DiFazio and his mother, Edith A. DiFazio, were the owners of a five building apartment complex located in the city of Hartford known as Broadview Gardens. The plaintiff bank financed construction by a mortgage loan on the com-

---

[1] In the original action, Hartford National Bank and Trust Company foreclosed its mortgage on the property at issue herein. The defendants counterclaimed against the bank alleging, in seven counts, claims of breach of contract and fiduciary duty, fraud and negligence. The trial court held for the plaintiff on the complaint and on the counterclaim. On appeal from the judgment on the counterclaim, the Supreme Court found error and remanded for a new trial limited to the counterclaim after finding material facts challenged by the defendants were unsupported by the evidence. *Hartford National Bank & Trust Co.* v. *DiFazio,* 177 Conn. 34, 411 A.2d 8 (1979).

plex. In 1973, as a result of increasing losses from the project, the DiFazios attempted to convert the apartment complex into condominium units with the assistance of state and federal "home ownership" programs. Pursuant to these programs, the Connecticut housing finance authority (CHFA) was to provide mortgages to the purchasers of individual condominium units to be insured by the federal department of housing and urban development (HUD). HUD imposed conditions upon the project before agreeing to provide mortgage insurance. These conditions included, among others, requirements that the DiFazios (1) complete capital improvements valued at nearly $100,000; (2) settle all outstanding financial obligations prior to the closing of the first sale; and (3) presell 80 percent of the value of the units in the complex. This last requirement was the major condition and, on application of the defendants, was later reduced by HUD to 65 percent of each type of unit involved in the project. HUD's commitment to provide insurance for the venture, if these conditions were met, was issued for one year, but was extendable if circumstances dictated.

The defendants employed, as their agent for the sale of the units, Invest Management Group, Inc. In 1974, after another processing agent withdrew, the plaintiff bank undertook to handle the processing of condominium purchase applications for an origination fee of .75 percent of the principal amount of mortgages closed. The bank's first mortgage was then in default. The plaintiff assigned Thomas Kelly, a junior mortgage official, to the responsibility of screening applications. During his association with the defendants for about three months, Kelly spent the greater portion of his time embezzling in excess of $100,000 from the bank until he departed on a vacation from which he never returned.[2] When he voluntarily left the bank and his

---

[2] Kelly was subsequently convicted and sentenced after pleading guilty to charges of embezzlement and conspiracy to commit embezzlement.

responsibility to the defendants, Kelly took with him their file containing unprocessed mortgage applications submitted to the bank by Invest. These documents were subsequently recovered a few weeks later from a Hartford parking garage. The bank then assigned another of its officers, William McCue, in replacement for Kelly, to process the condominium applications. McCue retained this duty until the condominium conversion project was abandoned in January, 1975, no sale of a condominium unit having been completed.

In August, 1975, the present action was instituted by the bank to foreclose the defendants' mortgage. The defendants counterclaimed against the plaintiff seeking damages for the failure of the condominium project. After trial, judgment was rendered for the plaintiff on the foreclosure and also on the counterclaim. The defendants appealed only from the judgment on their counterclaim. By its decision, reported in 177 Conn. 34, 411 A.2d 8 (1979), the Supreme Court remanded the counterclaim for a new trial.

On retrial, the court, *Gaffney, J.,* held that Kelly's failure to process the applications while he pursued his embezzlement scheme was not a material factor in the failure of the defendants' venture. Rather, the court concluded that Kelly's role in the project's collapse was "of only peripheral significance," and that the true cause of the failure of the defendants' condominium conversion project was their unwillingness and financial inability to comply with HUD's preconditions for mortgage insurance to finance the unit sales, especially its requirement "that the total outstanding financial obligations [which] are in the neighborhood of $780,000 . . . would have to be settled prior to the closing of the first sale."

The defendants' first claim of error is that Judge Gaffney should have granted their motion that he

recuse himself from trying the case. In support of this assignment, they recite a long litany of the political rivalry between the Gaffney and DiFazio families in New Britain. They also maintain that Judge Gaffney was acquainted with William McCue, the plaintiff's officer, who was placed in charge of the mortgage applications upon Kelly's abandonment of his employment and who was a principal witness in the case. The defendants failed to support these allegations at trial, with the exception of Judge Gaffney's acquaintance with the DiFazio family and McCue. Counsel for the defendants stated, prior to the introduction of evidence at trial, that Pasquale DiFazio, husband of the defendant Edith A. DiFazio and father of the defendant Paul T. DiFazio,[3] "recalled that he had been acquainted with you and other members of the Gaffney family over the years, and was also under the impression that Your Honor was acquainted with Mr. William McCue, who will be a witness in the case." In response to the defendants' motion for rectification of this appeal, the court filed an addendum to its memorandum of decision, stating as follows: "Counsel did not elaborate further on the ground of the motion or request permission to present evidence in reference thereto. Moreover, at no time was it expressly claimed that Mr. DiFazio's acquaintanceship with the court and other family members or the court's acquaintanceship with witness-McCue would cause the court to become biased or infringe on the appearance of impartiality. *Papa* v. *New Haven Federation of Teachers*, 186 Conn. 725, 744–46 [444 A.2d 196] (1982)." (Footnote omitted.)

On the basis of the record before us, we are unable to conclude that Judge Gaffney erred in failing to recuse himself. We cannot go beyond the proper record before us in the détermination of issues presented on appeal.

[3] Paul T. DiFazio became medically incapacitated prior to the retrial of this counterclaim. His father acted on his behalf with power of attorney.

*Grunschlag* v. *Ethel Walker School, Inc.,* 189 Conn. 316, 320, 455 A.2d 1332 (1983); *Burkert* v. *Petrol Plus of Naugatuck, Inc.,* 5 Conn. App. 296, 300 n.3, 497 A.2d 1027 (1985).[4]

While proof of actual bias is not required in order to obtain a judge's recusal; *Cameron* v. *Cameron,* 187 Conn. 163, 170, 444 A.2d 915 (1982); the record must "give fair support to [the] claim [of actual bias]." *Szypula* v. *Szypula,* 2 Conn. App. 650, 656, 482 A.2d 85 (1984). The mere assertion of an acquaintance between the court and two of the witnesses before it, in this case, constitutes nothing more than "vague and unverified assertions of opinion and speculation" regarding the court's impartiality. Id.

In *Cameron* v. *Cameron,* supra, the court was faced with such an undeniable record of the trial court's actual bias toward the defendant that review of the claim, even under the "plain error" doctrine of Practice Book § 3063, mandated reversal. Id., 168–71. In the present case, however, the record does not even indicate the presence of a situation which would justify the necessary "suspicion as to the fairness of the court's administration of justice" which is required in order to make a claim of actual bias. *Krattenstein* v. *G. Fox & Co.,* 155 Conn. 609, 615, 236 A.2d 466 (1967). Hence, we cannot find error based upon the record before us.[5]

---

[4] While the assertions in the defendants' brief suggest a justification for recusal, this court cannot consider them in the absence of these facts from the trial record.

[5] The disqualification of judges in Connecticut is governed by General Statutes § 51-39 and Canon 3 (C) of the Code of Judicial Conduct. *Papa* v. *New Haven Federation of Teachers,* 186 Conn. 725, 744, 444 A.2d 196 (1982); *Szypula* v. *Szypula,* 2 Conn. App. 650, 654, 482 A.2d 85 (1984). "Although Canon 3 (C) states the substantive norm for disqualification . . . it does not articulate the procedural standards which a litigant must meet." *Szypula* v. *Szypula,* supra.

Practice Book §§ 995 through 997 set forth the procedure for disqualifying a judge in criminal cases; see *State* v. *Weber,* 6 Conn. App. 407, 411–13,

With regard to two of the defendants' other claims of error, specifically claims eight and nine of the defendants' brief asserting that the trial court gave undue weight to the HUD presale requirements and the testimony of Joseph DiPaolo, an employee of the plaintiff, we note that these claims were not noticed in the defendants' preliminary statement of issues as required by Practice Book § 3012 (a). We, therefore, decline to review those claims.

Of the remaining claims of error, the first to be considered is the claim that the court gave undue weight to the testimony of Barbara Kamanitz, an employee of Invest, concerning the reasons she assigned, in a letter to the defendants' counsel, for the project's failure,[6]

---

505 A.2d 1266 (1986); however, there are no parallel provisions in our civil rules of practice which would govern the present case. See *Szypula* v. *Szypula,* supra.

[6] The letter, admitted into evidence as Plaintiff's Exhibit J, reads, in pertinent part, as follows:

"January 28, 1975

Mr. Marty Webber
Webber, DiFazio, Webber
661 Wethersfield Avenue
Hartford, Connecticut

RE: Broadview Gardens

Dear Marty:

Broadview Gardens is a unique apartment complex - unique because of its repetitive problems that have continually confronted the ability to achieve financial stability from the initial conception. These problems are distinct, yet interrelated and [have affected] the complex by compounding the problems and by preventing financial corrective measures . . . .

We are now forced to terminate the condominium project for the following reasons:

1. Market conditions - [Although] we had an attractive financial package for prospective buyers, the economic crisis of inflation and of tight-money narrowed the number of buyers.

2. Applicant qualifications - Many of the prospective buyers were borderline cases who subsequently had difficulties in meeting their financial responsibilities.

3. High turnover of purchases - This was related to the applicant[s'] housing history. Most of these applicants were never able to distinguish the apart-

and that the court ignored the evidence offered by the defendants that Kamanitz was pressured by the plaintiff not to disclose that the negligence of the bank and the fraud of its employee precipitated the project's failure. In evaluating the evidence, the court found the contents of this letter to be "particularly illuminating." The court, in its memorandum of decision, noted that "[t]he defendants are critical of the letter which they assert was orchestrated by Richard Clinton, an officer of the Bank, who insisted it contain no reference to Kelly and whatever responsibility might be attributable to him for failure of the project." Nonetheless, it found as follows: "Apart from the lack of reference to the role of Thomas Kelly in the collapse of the project, a role which this court deems of only peripheral significance, the court perceives Miss Kamanitz's letter as an honest and straight-forward statement of fact. Her observations, particularly the first quoted paragraph, constitute a valid appraisal of built-in problems which, it soon become apparent, were of unsurmountable magnitude."

ment concept from the ownership concept. They expected two-day processing of the applications which is the traditional time frame for renters - they could not completely understand the time element or the processing procedures required by the bank, HUD and CHFA. Many were looking for immediate housing and would not move into the complex until they were officially accepted by the various institutions; the time element conflicted with their immediate needs.

4. High maintenance costs - In order to convert the complex, we have had to spend money. Money on refurbishing of the exterior and interior of the complex as a unit and of the individual apartments. This area has also increased because of the high turnover of purchases - we had much movement in and out of the same apartment units by different buyers which was requiring additional maintenance work because of the damage or neglect caused in the short period of time during the tenant-owner residency period . . . .

We have sent copies of this letter to Mr. DiFazio and to Hartford National Bank.

Sincerely yours,

Barbara L. Kamanitz
Vice President"

It has long been held that the evaluation of witnesses and their credibility is peculiarly within the province of the trier of fact. *Robert S. Weiss & Co.* v. *Mullins,* 196 Conn. 614, 621, 495 A.2d 1006 (1985); *Jazlowiecki* v. *Cyr,* 4 Conn. App. 76, 77, 492 A.2d 516 (1985). We cannot conclude here that the trial judge's evaluation of the Kamanitz letter was clearly erroneous. Nor can we say, as the defendants would have us do, that the court "blatantly ignore[d]" Kamanitz's testimony regarding the bank's request that Kelly's role not be mentioned in the letter then proposed to be written to HUD. The court expressly noted the defendants' criticisms of the letter. We find no error on this claim.

Similarly, we conclude that the court's refusal to admit a letter, written by Kelly to his sentencing judge, requesting clemency and sentence reduction in 1975 was not an abuse of discretion. The letter was written almost one year after the events in question, and was obviously drafted in an effort to portray Kelly in the best possible light. The court, having read the letter, concluded that "the ramblings of the writer have absolutely no probative significance" and upheld the objection to its admission. We cannot conclude that this was error.

The defendants next claim that the court erred in excluding, in part, the testimony of Henry Newberry, president of New Britain National Bank during the time of the events at issue. Specifically, the court ruled that Newberry could not testify regarding the substance of a telephone conversation between himself and an employee of the plaintiff bank named DeMeara[7] expressing the plaintiff's confidence in the success of the undertaking, on the ground that no evidence was offered to prove that DeMeara was an agent authorized to speak on behalf of the plaintiff.

---

[7] This name, given a phonetic spelling by the court reporter, appears nowhere else in this record. We use that phonetic spelling here in the interest of clarity.

The defendants assert that sufficient foundation was laid for Newberry's testimony as to the statements of DeMeara after he had testified that he telephoned the plaintiff and spoke to an employee there. This argument intermixes two separate, but related, evidentiary rules concerning the identity of a speaker and the subject of a conversation.

There is a general evidentiary rule under which "proof of proper placing of a call plus self-identification of the speaker . . . [is] sufficient proof of authenticity to admit the substance of the call." McCormick, Evidence (3d Ed.) § 226 (1984). That rule, however, relates to authentication of the identity of the recipient of the call, rather than to the admissibility of any hearsay testimony which was involved in the telephonic conversation. Thus, the argument in the defendants' brief is inapposite, for this rule relates to the authentication of the parties to the call, rather than to any hearsay objections raised with regard to the substance of the call. See *International Brotherhood* v. *Commission on Civil Rights,* 140 Conn. 537, 546, 102 A.2d 366 (1953). For testimony regarding the substance of the call to rise above hearsay objection, another test must be satisfied. A broad statement of that rule is that the statement of an agent is admissible as an admission against his principal "if the statement concerned a matter within the scope of the declarant's employment and was made before that relationship was terminated." McCormick, supra, § 267. Thus, in another case cited by the defendants; *Collins* v. *Lewis,* 111 Conn. 299, 149 A. 668 (1930); the court ruled that a telephone conversation between the plaintiff's attorney and the defendant's attorney was binding on the plaintiff since "[t]he ostensible authority of the plaintiff's attorney to speak for the plaintiff in this conversation with the defendant's attorney, under the well known rules of agency, is undoubted." Id., 305.

In the present case, the true identity and office of the plaintiff's alleged "agent" is in doubt, as well as the scope of any agency relationship between him and the plaintiff. "Before evidence can be admitted to show what an agent said, it must be established that the agent was authorized by the principal to make an admission. . . . No evidence relating to such authority was offered by the defendants." *Robles* v. *Lavin,* 176 Conn. 281, 284, 407 A.2d 959 (1978). Thus, the court did not err in excluding Newberry's testimony of his telephone conversation with an employee of the plaintiff.

The defendants next claim that the court erred in failing to apply evidentiary presumptions supporting the qualification and number of mortgage applicants to meet HUD requirements. They argue that the plaintiff was unable to produce in court the applications which had been forwarded to it by the defendants' sales agent. As a result, they maintain that the court should have presumed that the applications would have been approved by HUD, rather than concluding that "the evidence is far from clear that the plaintiff at the latter juncture was readily able to obtain necessary verification and credit information to satisfy HUD requirements," leading to delays at best, and disqualification at the worst. We fail to see the merit to this argument, or how it aids the defendants' position. The court concluded that a variety of problems led to the downfall of this project, only one of which was the disputed number of qualified applicants. In fact, the court expressly concluded that the failure of the project was "due largely to the myriad of governmental requirements and [was] complicated by the defendants' tenuous financial stability . . . ." The court's doubt over individual applicants' qualifications for lack of credible evidence was of minor significance and does not warrant reversal of the judgment.

Finally, the defendants claim error (1) in the granting of the plaintiff's motion to strike the retrial from the jury docket by Judge O'Neill; and (2) in the subsequent denial by Judge Gaffney of their motion to restore the case to the jury docket at the commencement of trial. We find that the court's rulings on both motions were correct.

The original trial of the foreclosure action and the defendants' counterclaims was held before the court without a jury. When a case is remanded by the Supreme Court "for a new trial, it goes back to the same docket as before." *Rowell* v. *Ross,* 91 Conn. 702, 708, 101 A. 333 (1917). It properly remained there on retrial, unless a new issue of fact was joined which would permit the parties to move for a transfer to the jury docket pursuant to General Statutes § 52-215. The mere fact that the case is being retried does not alone permit either party the option of re-evaluating the mode of trial. If a case was originally tried to the court without a jury, that is where the retrial belongs in the absence of any new issue of fact. There was no new issue of fact raised in this case on its retrial. Although the original counterclaim of the defendants considered by the Supreme Court on appeal contained seven counts and their substituted counterclaim filed on retrial contained only five counts, the latter raised no new issues of fact. Section 52-215 provides that within ten days after an issue of fact has been joined, the case may be claimed by either party for the jury docket. "Where such a claim has not been made at the original close of the pleadings, the mere filing of amended [or substituted] pleadings which raise no new issues of fact does not give rise to a further opportunity to claim a case for the jury. *Atta* v. *Cutner,* 95 Conn. 576[, 111 A. 847 (1920)]." *Stawicki* v. *Fraiser,* 36 Conn. Sup. 343, 344, 420 A.2d 913 (1980).

There is no error.

In this opinion the other judges concurred.