ANGELO JOYNER *v.* COMMISSIONER OF
CORRECTION
(AC 17716)

Lavery, Landau and Dupont, Js.

Argued March 3—officially released November 2, 1999

*James A. Killen*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Christopher A. Alexy*, assistant state's attorney, for the appellant (respondent).

*Denise Ansell*, special public defender, for the appellee (petitioner).

*Opinion*

DUPONT, J. The sole issue in this appeal from the granting of a petition for a writ of habeas corpus is whether the respondent commissioner of correction (commissioner)[1] was deprived of an impartial fact finder when the trial court denied the commissioner's motion to recuse the judge. We conclude that the motion was properly denied and affirm the judgment of the habeas court.

The following facts are relevant to this appeal. In March, 1989, the petitioner, Angelo Joyner, was arrested and charged with one count of assault in the first degree, three counts of sexual assault in the first degree and one count of kidnapping in the first degree. Attorney Samuel Dixon represented the petitioner at his criminal trial. Dixon's trial strategy was to assert a defense of guilty by reason of mental disease or defect. The petitioner was convicted on all counts in June, 1991,[2] and subsequently was sentenced to fifty years in prison.

Prior to the representation of the petitioner in the criminal matter, Dixon had represented the estate of the petitioner's father in a wrongful death action. The wrongful death action ended with a settlement, the proceeds of which became the corpus of the deceased's estate. Dixon also served as the administrator of the estate. A judge of probate approved the estate accounting and ordered the estate distributed in shares of nearly $23,000 each to the petitioner and his brothers and sister. Dixon did not distribute the estate funds to the

[1] The pleadings and other documents in the file variously describe the respondent as the warden, the commissioner and the state of Connecticut.

[2] The facts related to the petitioner's criminal trial are set out in *State* v. *Joyner*, 225 Conn. 450, 625 A.2d 791 (1993), in which his conviction was affirmed on direct appeal.

heirs in a lump sum, but gave them cash from time to time, which sums allegedly did not equal the heirs' total inheritance. In his amended habeas corpus petition, the petitioner alleges that Dixon refused to give him the full sum of his inheritance so that the petitioner could hire a different attorney to represent him in the criminal matter, that Dixon claimed the funds had been garnished and that Dixon coerced the petitioner into letting Dixon represent him in the criminal matter.

Just prior to the issuance of the distribution order, the victim of the petitioner's criminal acts commenced a civil action against the petitioner and served a prejudgment remedy garnishment order on Dixon, as administrator of the estate. Dixon undertook to represent the petitioner in the civil action and represented to the victim's attorney that he had no funds belonging to the petitioner because they had been distributed.[3]

---

[3] During the criminal trial of the petitioner, the state filed a motion to disqualify Dixon as his counsel, claiming that Dixon was the executor of the estate of the petitioner's father, that the victim had filed a civil action against the petitioner and attached the proceeds of the estate, that Dixon also had a claim on the proceeds for attorney's fees in the criminal matter, and that a conviction in the criminal case would conclusively establish liability in the civil case thereby entitling the victim to damages, which would reduce the amount of money available for attorney's fees. The state argued that Dixon had a financial stake in the outcome of the criminal proceeding, which might be in conflict with the petitioner's interests.

The trial court in the criminal case, *Schimelman, J.*, held a hearing on the motion to disqualify Dixon before the trial began. In response to the trial court's question, Dixon stated that the Court of Probate had ordered him to distribute the funds, and that he had done so and no longer was holding any assets of the estate.

The trial court brought the potential conflict to the petitioner's attention. The court noted that a garnishment order had issued against Dixon for funds of the estate, meaning that both the victim and Dixon had a claim on the funds, that Dixon was representing the petitioner in both the civil and the criminal cases, and that the petitioner might not get the best representation as a result.

The trial court also had the petitioner meet privately with a public defender to discuss the potential conflict. The public defender reported to the court that the petitioner was aware of the potential conflict as stated in the state's motion to disqualify. Thereafter, the petitioner conveyed to the court,

The petitioner's amended habeas corpus petition further alleges that he was denied the effective assistance of counsel in violation of his rights under the sixth amendment to the United States constitution and article first, § 8, of the Connecticut constitution. The petitioner claims in his petition that Dixon had a conflict of interest in representing him in the criminal trial, the full extent of which was unknown to the petitioner or the trial court,[4] and that the conflict adversely affected Dixon's representation of him. The petitioner also claims in his petition that Dixon's performance fell below the ordinary skill expected from attorneys practicing criminal law and lists seventeen specific reasons to substantiate the ineffective assistance of counsel claim, which relate to the conduct of the petitioner's defense, including evidentiary errors, the failure to introduce evidence and to present a defense of consent to the sexual assault charges, and the failure to preserve claims for appellate review.

After the petitioner obtained a special public defender for the trial of his amended petition for a writ of habeas corpus, Dixon refused to cooperate with the special public defender by failing to turn over his file and other records. The habeas judge became involved in the pretrial discovery motions because Dixon failed to cooperate with the petitioner's counsel. Dixon failed to obey a subpoena served on him by the commissioner, who was acting by order of the habeas court. The habeas court then issued a capias, which Dixon successfully evaded. The special public defender eventually

through the public defender, that he wanted Dixon to continue to represent him. Eventually, the petitioner also specifically waived his right to a conflict free counsel.

[4] The habeas court concluded that there was good cause for the petitioner's failure to preserve the claim relating to Dixon's conflict of interest at trial and that actual prejudice resulted from the alleged constitutional violation. The court, therefore, did not preclude the petitioner from raising the issue at the habeas trial. See *Wainwright* v. *Sykes*, 433 U.S. 72, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977).

obtained records from Dixon's bank via a subpoena ordered by the court. During her investigation of the petitioner's allegations of Dixon's conflict of interest, the special public defender discovered information leading her to believe that Dixon had misappropriated the petitioner's inheritance and reported her findings to the habeas judge. The habeas court, *Rittenband, J.*, on the basis of the representations of the special public defender and testimony from an officer of a bank where Dixon had numerous accounts, referred the allegations to the statewide grievance committee and the chief state's attorney.

Before evidence was heard on the habeas petition, the commissioner moved to recuse the habeas judge claiming that he was biased against Dixon. The alleged bias, according to the commissioner, concerned the referrals to the chief state's attorney and to the statewide grievance committee for investigation of Dixon's conduct. The thrust of the claim was that the habeas court could not view Dixon, the presumed witness, impartially after such referrals. The motion was referred by the habeas judge to another trial court. That court, *Klaczak, J.*, denied the motion, concluding that the habeas court had not prejudged Dixon but had simply set investigations in motion. Judge Klaczak assumed, as did the commissioner, that Dixon would be a witness during the habeas trial.

After the second day of evidence in the habeas trial, the commissioner moved for a mistrial claiming that the habeas judge had made remarks indicating a lack of impartiality toward the petitioner. The motion was denied.

Later, during the trial, the habeas judge learned that the chief state's attorney's office had declined to prosecute Dixon because of a problem with the statute of limitations and because there was no evidence that the

beneficiaries of the estate of the petitioner's father had not been paid their inheritance. In response to a letter from the state's attorney's office inviting the habeas judge's questions about the investigation, the judge telephoned the prosecutor assigned to investigate the matter and questioned the thoroughness of the investigation.

The commissioner was made aware of the telephone call by the habeas judge, and the commissioner again moved for the habeas judge to recuse himself and for a mistrial. The motion for recusal and mistrial was referred to yet another trial court, Hon. Harry Hammer, judge trial referee, for review. That court denied the motion, giving its reasons for the denial in a signed thirty-three page transcript of the trial court's opinion.

The trial court stated that the controlling issue in a motion to recuse is whether a reasonable person, aware of all the circumstances surrounding the proceeding, would question the judge's impartiality. The court also stated that the determination of whether impartiality had been compromised in this case related to the court's ability to weigh and consider fairly the testimonial evidence, if any, of Dixon. The court denied the motion without prejudice and permitted renewal of it if there came a point in the habeas proceeding when Dixon's credibility became an issue, that is, if Dixon eventually testified. The motion to recuse never was renewed and, in fact, Dixon never testified during the habeas hearing.

After the commissioner's motion was denied without prejudice, Dixon was subpoenaed to testify. He appeared with counsel and invoked his fifth amendment privilege not to testify. The habeas judge stated that he found Dixon lacking in credibility because of an adverse inference drawn from Dixon's failure to testify, and not from any testimony by Dixon.

The most recent Supreme Court case of which we are aware on the subject of recusal is *Abington Ltd. Partnership* v. *Heublein*, 246 Conn. 815, 717 A.2d 1232 (1998). In that case, the court held that an ex parte visit of the trial judge to the site of property directly involved in the litigation before him violated canon 3 (c) (1) of the Code of Judicial Conduct[5] because the visit created an appearance of impropriety, which allowed the judge's impartiality reasonably to be questioned. Id., 825–26. The court reiterated the test for such a violation of the canon. "Any conduct that would lead a reasonable [person] knowing all the circumstances to the conclusion that the judge's impartiality might reasonably be questioned is a basis for the judge's disqualification. Thus, an impropriety or the appearance of impropriety . . . that would reasonably lead one to question the judge's impartiality in a given proceeding clearly falls within the scope of the general standard . . . . The question is not whether the judge is impartial in fact. It is simply whether another, not knowing whether or not the judge is actually impartial, might reasonably question his . . . impartiality, on the basis of all of the circumstances. . . . *Papa* v. *New Haven Federation of Teachers*, 186 Conn. 725, 745–46, 444 A.2d 196 (1982); *Dubaldo* v. *Dubaldo*, 14 Conn. App. 645, 649, 542 A.2d 750 (1988)." (Internal quotation marks omitted.) *Abington Ltd. Partnership* v. *Heublein*, supra, 820.

Any factual disputes involved in a claim of judicial bias may require an evidentiary hearing and, if so, it should be conducted before another judge. *Szypula* v. *Szypula*, 2 Conn. App. 650, 653, 482 A.2d 85 (1984). It has long been settled that the bias or prejudice sufficient to result in a disqualification "must stem from an extrajudicial source and result in an opinion on the merits

---

[5] Canon 3 (c) (1) of the Code of Judicial Conduct provides in relevant part: "A judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned . . . ."

on some basis other than what the judge learned from his participation in the case." *United States* v. *Grinnell Corp.*, 384 U.S. 563, 583, 86 S. Ct. 1698, 16 L. Ed. 2d 778 (1966); *Barca* v. *Barca*, 15 Conn. App. 604, 613, 546 A.2d 887, cert. denied, 209 Conn. 824, 552 A.2d 430 (1988); *Szypula* v. *Szypula*, supra, 655.

The standard for appellate review of whether the facts require disqualification is whether the court's discretion has been abused. *Abington Ltd. Partnership* v. *Heublein*, supra, 246 Conn. 824. The question then becomes whether an objective observer reasonably would doubt the judge's impartiality given the circumstances. Id., 825–26. If an objective observer, in view of all of the facts would reasonably doubt the court's impartiality, the court's discretion would be abused if a motion to recuse were not granted. "In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done." (Internal quotation marks omitted.) *Glass* v. *Peter Mitchell Construction Leasing & Development Corp.*, 50 Conn. App. 539, 543, 718 A.2d 79, cert. granted on other grounds, 247 Conn. 938, 723 A.2d 317 (1998) (appeal withdrawn July 6, 1999).

The outcome of *Abington Ltd. Partnership* rested on its particular facts because each such case must be evaluated on its own facts. *Abington Ltd. Partnership* v. *Heublein*, supra, 246 Conn. 826. An objective observer in that case reasonably could have questioned the judge's impartiality because he had, during the trial, visited the site on his own, used a private road to gain access, gained entrance to a private dwelling on pretextual grounds, initiated a conversation with the owner of the private dwelling about the litigation, listened to

information the owner had, failed to disclose his identity until leaving the premises and failed to inform trial counsel of the visit and conversation. Id., 825.

Only two other Supreme Court cases, using the same test for the application of canon 3 (c) (1), concluded that the trial judge should have been recused. In *Papa* v. *New Haven Federation of Teachers*, supra, 186 Conn. 746–47, the court determined that the judge's comments to a news reporter, while the case he was hearing was pending, as to the propriety of illegal teachers strikes, which was the subject of the case in question, would cause a reasonable person to question the judge's impartiality. In the second case, *Cameron* v. *Cameron*, 187 Conn. 163, 170–71, 444 A.2d 915 (1982), the court held that recusal was necessary because the judge, during the trial, took the position that the defendant had falsely testified at a deposition, accused the defendant and his counsel of attempting to perpetrate a fraud on the court, stated that the defendant's counsel has had trouble with the court before with some of his "clients absconding," and that whether the defendant's counsel had ever been unprofessional before the trial judge or any other judge was "questionable."

In a myriad of other cases, the denial of a motion to recuse was upheld because the judge's impartiality was not sufficiently compromised. See *State* v. *Webb*, 238 Conn. 389, 462, 680 A.2d 147 (1996) (judge presided on previous case involving defendant); *Bonelli* v. *Bonelli*, 214 Conn. 14, 19, 570 A.2d 189 (1990) (judge had previous cocounsel relationship with plaintiff's attorney); *State* v. *Watson*, 198 Conn. 598, 611, 504 A.2d 497 (1986) (alleged participation in negotiating plea bargain); *State* v. *Lopez*, 197 Conn. 337, 356–57, 497 A.2d 390 (1985) (sentencing judge allegedly heard privileged information); *State* v. *Fullwood*, 194 Conn. 573, 579–81, 484 A.2d 435 (1984) (alleged participation in pretrial negotiations); *State* v. *Gradzik*, 193 Conn. 35, 44–46, 475 A.2d

269 (1984) (participation in plea negotiations); *Culhane* v. *Aetna Life Ins. Co.*, 124 Conn. 237, 244–45, 199 A. 103 (1938) (blood relationship to plaintiff's witness); *Emerick* v. *Kuhn*, 52 Conn. App. 724, 761–63, 737 A.2d 456, cert. denied, 249 Conn. 929, 738 A.2d 653 (1999) (judge took into account pro se status of plaintiff); *State* v. *Montini*, 52 Conn. App. 682, 692–96, 730 A.2d 76, cert. denied, 249 Conn. 909, 733 A.2d 227 (1999) (judge's general interest in child victim's rights); *Weyel* v. *Catania*, 52 Conn. App. 292, 299, 728 A.2d 512, cert. denied, 248 Conn. 922, 733 A.2d 846 (1999) (judge's acquaintance with store owned by parents of plaintiff's girlfriend); *DeMatteo* v. *DeMatteo*, 21 Conn. App. 582, 589–92, 575 A.2d 243, cert. denied, 216 Conn. 802, 577 A.2d 715 (1990) (vague and unverified assertions concerning ex parte judicial actions and comments of judge about professional conduct of defendant's counsel); *State* v. *Messier*, 16 Conn. App. 455, 457–60, 549 A.2d 270, cert. denied, 209 Conn. 829, 552 A.2d 1216 (1988) (judge's pretrial involvement); *Barca* v. *Barca*, supra, 15 Conn. App. 613–14 (comments of judge regarding truthfulness of defendant not stemming from extrajudicial source but related to merits of case and no preconceived view of credibility of witness); *LaBow* v. *LaBow*, 13 Conn. App. 330, 337–40, 537 A.2d 157, cert. denied, 207 Conn. 806, 540 A.2d 374 (1988) (comments showed impatience with defendant and his counsel); *Giordano* v. *Giordano*, 9 Conn. App. 641, 643–45, 520 A.2d 1290 (1987) (comment in chambers); *Keppel* v. *BaRoss Builders, Inc.*, 7 Conn. App. 435, 444–45, 509 A.2d 51, cert. denied, 201 Conn. 803, 513 A.2d 698 (1986) (statements of agitation); *Hartford National Bank & Trust Co.* v. *DiFazio*, 6 Conn. App. 576, 579–81, 506 A.2d 1069, cert. denied, 200 Conn. 805, 510 A.2d 192 (1986) (assertion of acquaintance between judge and two witnesses); *Perlmutter* v. *Johnson*, 6 Conn. App. 292, 294, 505 A.2d 13, cert. denied, 200 Conn. 801, 509 A.2d 517

(1986), cert. denied, 479 U.S. 1035, 107 S. Ct. 86, 93 L. Ed. 2d 839 (1987) (prior professional dealings and prior acquaintance with plaintiff).

Facts common to all of those cases upholding the denial of a motion to recuse are that the bias involved one of the parties or their present counsel, or a witness, rather than a potential or putative witness, and that even when the claim concerned an extrajudicial or ex parte event or situation related to the case pending before the trial court, recusal was not necessary unless, objectively, a reasonable person would view the failure to recuse as a strike at the core of judicial integrity that undermines public confidence in the judiciary.

The three cases that reversed the denial of a motion to recuse do not contain facts that are common to the present case. In *Abington Ltd. Partnership* v. *Heublein*, supra, 246 Conn. 825, the judge sought and obtained extrajudicial information secretly, rendered a decision on the merits that could have been influenced by that information not learned by the judge from his participation in the case, and the ex parte event was not communicated by the judge to either party. In *Papa* v. *New Haven Federation of Teachers*, supra, 186 Conn. 746–47, the judge commented publicly outside the courtroom while the case was pending before him as to his views on the very issue he had yet to decide. In *Cameron* v. *Cameron*, supra, 187 Conn. 165, the judge commented in a derogatory manner about the defendant's counsel, referring to prior cases of that counsel before the judge and to counsel's general reputation among judges. The judge also accused the defendant of perpetrating a fraud on the court and of having lied during a previous deposition. Id., 170–71.

We conclude that the trial court in this case properly denied the commissioner's motions to recuse. The factors on which we rely include the fact that the outcome

of the habeas hearing did not depend on the testimony of Dixon, who in fact was not a witness at all, but on whether the petitioner had received ineffective assistance of counsel, which was the primary question for the judge. This question involves a determination not only of whether Dixon had a conflict of interest while representing the petitioner, but it involves issues concerning Dixon's general inexperience as a criminal trial lawyer, the conduct of the defense and the trial strategy relating to the use of the particular defense. We also note that two other judges analyzed the facts and concluded that the habeas judge need not have recused himself, and that at the time the motion to recuse was made, grievances Dixon had filed against the habeas judge and the petitioner's attorney in the habeas trial had been dismissed. Furthermore, the habeas judge himself made the parties aware of his telephone call to the state's attorney in charge of Dixon's investigation.

By a fair preponderance of the evidence, the habeas judge found that Dixon had misappropriated the petitioner's money. It is hard to understand how any judge could have concluded otherwise. This was but one fact among many related to whether the petitioner had received ineffective assistance of counsel.

Most members of the public would commend the habeas court for referring the matter of his recusal to two other judges and for asking the grievance committee and the state's attorney to investigate Dixon's actions. The habeas judge's telephone call to the state's attorney as to the status of the investigation was not, in our opinion, an indication of a bias or the appearance of a bias that would call into question the judge's ability to decide the case impartially.

We decide this case on its particular facts; see *Abington Ltd. Partnership* v. *Heublein*, supra, 246 Conn. 826; and hold that the habeas judge did not exhibit bias and

prejudice stemming from an extrajudicial source that resulted in an opinion on the merits on some basis other than what he learned from his participation in the case. We therefore conclude that the trial court did not abuse its discretion in denying the motions to recuse.

The judgment is affirmed.

In this opinion LANDAU, J., concurred.

LAVERY, J., dissenting. An appearance of impropriety is the standard by which judicial conduct is to be weighed. See Code of Judicial Conduct Canon 3 (c) (1). Because I believe that the habeas judge created an appearance of impropriety, regardless of whether he was fair and impartial and whether there was probable cause to grant the habeas petition, I respectfully dissent from the majority opinion.

The respondent commissioner of correction (commissioner) claims that the habeas judge's refusal to recuse himself after he initiated and then urged pursuit of criminal and ethical investigations of attorney Samuel Dixon and declared that he had found probable cause to believe that Dixon had committed criminal and ethical violations deprived the commissioner of an impartial fact finder.[1] After thoroughly reviewing the transcripts, I agree with the commissioner only[2] with respect to the comments made by the habeas judge on the record at the end of the first day of trial and before trial resumed in September, 1996.[3]

---

[1] On appeal, the commissioner makes no claim that the habeas court improperly referred the matter to the statewide grievance committee or to the chief state's attorney.

[2] I agree with the majority that it was entirely appropriate for the habeas judge to refer the question of Dixon's alleged criminal wrongdoing to the state's attorney when it first came to his attention. See Code of Judicial Conduct Canon 3 (b) (3).

[3] At the end of the first day of trial, the following colloquy took place in response to an objection from the commissioner.

"The Court: First of all, I'll give such weight to it as it deserves. Secondly, I have no doubt from the testimony I've heard without the notes that Mr. Dixon took the money, apparently before [the victim's lawyer] informed

Our law mandating an impartial judiciary is very clear. "No more elementary statement concerning the judiciary can be made than that the conduct of the trial

him of the lawsuit; and also that he told—if I believe [the petitioner] that the money was already attached, or such, before he knew about the lawsuit. I have stated this repeatedly. The fact that Mr. Dixon may have committed terminological inexactitudes . . . . The fact that he has committed lies I'm aware of. I'm not sure, at this point, what it has to do with ineffective assistance of counsel, or the conflict that you allege between Mr. Dixon and [the petitioner]. The point being, if [the petitioner] had been acquitted, what difference does it make whether he told something wrong to [the petitioner]? The point is, suppose that he told [the petitioner] something that's not true, okay, and then he went ahead and did his questions and answers and whatever, and I read the transcript and after all the testimony I conclude that he did an effective job. What difference does it make?

⁂

"[The Prosecutor]: To be quite honest, Your Honor, I'm not sure what the purpose of a cross-examination would be at this point. The court has already indicated that it's found, as a matter of fact—the court said, I believe, 'I have no doubt that he took the money before he knew the civil suit was filed.'

"The Court: I didn't mean no doubt.

"[The Prosecutor]: And the court has indicated that he committed lies.

. . .

"The Court: I didn't mean no doubt, but I think the evidence has been presented at this point.

"[The Prosecutor]: Well, that was not what the court said.

"The Court: Well, then I misspoke. The point is, from the testimony from [the petitioner], from the testimony from [the victim's counsel] earlier, and from [the victim's] testimony, it appears that Mr. Dixon did not know of the lawsuit on May 10 when he allegedly told [the petitioner] that the money had been tied up by the lawsuit.

"[The Prosecutor]: Well, if Your Honor is obviously crediting the testimony of this witness over [that of the victim's counsel] because [the victim's counsel] testified that this witness was aware of it on May 2. Now, I don't know how much more plain the court could have made it. It's put me in an awkward position, and I don't want to have to renew my previous motion to recuse. When the court makes these types of findings of fact on the record before I even cross-examine this witness, let alone before I even present my case, it certainly creates at least an appearance . . . ."

The next trial day the commissioner moved for a mistrial on the basis of those comments, by the habeas judge. The motion was denied. The trial was recessed for several months due to the judge's illness. When the trial resumed in September, 1996, the habeas judge made the following statement on the record:

"The Court: Before we start with any evidence, I wanted to bring to the parties' attention certain items. Number one, on June 23, 1996, attorney

judge must be characterized by the highest degree of impartiality. If he departs from this standard, he casts serious reflection upon the system of which he is a

Samuel Dixon, the same Samuel Dixon who was here as the person who allegedly gave ineffective representation to [the petitioner], filed a complaint against me with the state of Connecticut judicial review counsel. On July 29, after the commission's first meeting, I wrote to Mr. Dixon asking for more information to substantiate his charges, continued the matter until August 21, not for a probable cause hearing but for initial determination, and I filed an answer on July 29. On August 21, not having heard from Mr. Dixon, the complaint was dismissed. And for counsel only, not for distribution, if you want to look at the complaint and the reply, you're free to do so. I state on the record I hold no ill will toward Mr. Dixon. I'm not biased or prejudiced against him in any way for his complaint and his actions in this regard.

\* \* \*

"The Court: Secondly, I did receive a letter from an assistant to the chief state's attorney, Julia Dewey I believe it is. I had the clerk send copies to both counsel. . . . I would point out to you that I remember the date of September 5, but I did contact attorney Dewey as to questioning the efficacy of the investigation. She did invite me in the letter to call her if I had any questions. I wanted to know the extent of the investigation to the effect that she stated that there were affidavits from the beneficiaries indicating that they were satisfied that all the money had been paid and that there was no evidence in the record apparently or no evidence that [the petitioner] had not been paid. I said, 'Are these affidavits taken by Mr. Dixon, or did your investigator actually talk to these people?' She refused to answer that. I did not reiterate an opinion that he had probably committed larceny. I don't recall saying that. I do recall asking her about whether she conducted a thorough investigation. I wanted to know how far that had gone. There seems to be a question as to what access the judge in a case like this has to the investigation by a state's attorney. She obviously felt I did not have access. I did call her back, did not reach her and left a message on the machine that I would not trouble her again. . . . I'm trying to get to the bottom of this. And [Dewey] presumed something which was untrue, but that is why I was questioning the efficacy of the investigation. I didn't question the efficacy, I questioned the thoroughness of it by asking how far they had gone, and she refused to tell me. I may have said something [like] 'it seems to me someone should have checked. Did you check over all the bank records.' I don't think she responded to that. I do not remember saying that he had probably committed larceny as alleged in this case. Sure, I found that there was probable cause to believe that attorney Dixon committed the crime of larceny, which is why I made the request of the state's attorney.

\* \* \*

"The fact that they have decided that there is no further need to pursue a criminal investigation, that's up to them. I did call attorney Dewey back

part. A judge is not an umpire in a forensic encounter. . . . He is a minister of justice. . . . He may, of course, take all reasonable steps necessary for the orderly progress of the trial. . . . In whatever he does, however, the trial judge should be cautious and circumspect in his language and conduct. . . . A judge should be scrupulous to refrain from hearing matters which he feels he cannot approach in the utmost spirit of fairness and to avoid the appearance of prejudice as regards either the parties or the issues before him. . . . A judge, trying the cause without a jury, should be careful to refrain from any statement or attitude which would tend to deny the defendant a fair trial. . . . It is his responsibility to have the trial conducted in a manner which approaches an atmosphere of perfect impartiality which is so much to be desired in a judicial proceeding." (Citations omitted; internal quotation marks omitted.) *Cameron* v. *Cameron*, 187 Conn. 163, 168–69, 444 A.2d 915 (1982).

"The 'appearance as well as the actuality of [partiality] on the part of the trier' will suffice to constitute proof of bias sufficient to warrant disqualification. Id., 170. The standard that we employ on appellate review is whether a reasonable person who is aware of the circumstances surrounding the judicial proceeding would question the judge's impartiality. *Papa* v. *New Haven Federation of Teachers*, 186 Conn. 725, 745–46, 444 A.2d 196 (1982); *Keppel* v. *BaRoss Builders, Inc.*, 7 Conn. App. 435, 440–41, 509 A.2d 51 [cert. denied, 201 Conn. 803, 513 A.2d 698] (1986)." *DeMatteo* v. *DeMatteo*, 21 Conn. App. 582, 590–91, 575 A.2d 243, cert. denied, 216 Conn. 802, 577 A.2d 715 (1990).

"Moreover, disqualification of a trial judge is not dependent upon proof of actual bias. The appearance

because I wanted her to understand. . . . Secondly, that I wouldn't bother her again, and I think I apologized if I may have pressed her too hard or something."

and the existence of impartiality are both essential elements of a fair trial. . . . Canon 3 (c) (1) of the Code of Judicial Conduct requires a judge to disqualify himself in any proceeding in which judicial impartiality might reasonably be doubted." (Citation omitted; internal quotation marks omitted.) *Consiglio* v. *Consiglio*, 48 Conn. App. 654, 659, 711 A.2d 765 (1998).[4]

"In analyzing this ground for disqualification, we emphasize the fundamental distinction between a claim of bias and a claim of an appearance of impropriety. Canon 3 (c) (1) provides in relevant part: 'A judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where: (A) the judge has . . . personal knowledge of disputed evidentiary facts concerning the proceeding . . . .' To prevail on its claim of a violation of this canon, the [commissioner] need not show actual bias. The [commissioner] has met [his] burden if [he] can prove that the conduct

---

[4] Canon 3 (c) (1) provides: "A judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:

"(A) the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

"(B) the judge served as lawyer in the matter in controversy, or a lawyer with whom the judge previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it . . .

"(C) the judge knows that he or she, individually or as a fiduciary, or his or her spouse or minor child residing in the judge's household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

"(D) the judge or the judge's spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

"(i) is a party to the proceeding, or an officer, director, or trustee of a party;

"(ii) is acting as a lawyer in the proceeding . . .

"(iii) is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

"(iv) is to the judge's knowledge likely to be a material witness in the proceeding . . . ."

in question gave rise to a reasonable appearance of impropriety." *Abington Ltd. Partnership* v. *Heublein,* 246 Conn. 815, 819–20, 717 A.2d 1232 (1998).

"Whether that evidence requires disqualification is an issue that, in the first instance, is left to the exercise of a trial judge's discretion. *Bonelli* v. *Bonelli,* [214 Conn. 14, 22, 570 A.2d 189 (1990)]. Accordingly, our review ordinarily is limited to the question of whether a trial judge has abused his discretion." *Abington Ltd. Partnership* v. *Heublein,* supra, 246 Conn. 824.

In this case, the habeas judge abandoned his position of impartiality and became an advocate by questioning the thoroughness of the investigation done by the state's attorney and so stating on the record. "The trial court should never assume a position of advocacy, real or apparent, in a case before it, and should avoid any displays of hostility or skepticism toward the defendant's case, or of approbation for the prosecution's. . . . A fine line separates proper and improper judicial conduct and the judge must strive to appear impartial and detached." (Citation omitted; internal quotation marks omitted.) *State* v. *Pharr,* 44 Conn. App. 561, 570, 691 A.2d 1081 (1997). "The judge occupies an exalted and dignified position; he is the one person to whom the jury, with rare exceptions, looks for guidance, and from whom the litigants expect absolute impartiality. An expression indicative of favor or condemnation is quickly reflected in the jury box and at the counsel table." (Internal quotation marks omitted.) Id.

"In evaluating whether, from an objective standpoint, these facts demonstrate a violation of canon 3 (c) (1), we start from two well established propositions concerning the appearance of judicial impropriety. Although stated separately, each proposition reenforces the other.

"The first proposition is that the prevention of the appearance of impropriety is of vital importance to the judiciary and to the judicial process. *Bonelli* v. *Bonelli,* [supra, 214 Conn. 19]. Members of the judiciary should be acutely aware that any action they take, whether on or off the bench, must be measured against exacting standards of scrutiny to the end that public perception of the integrity of the judiciary will be preserved . . . . There must also be a recognition that any actions undertaken in the public sphere reflect, whether designedly or not, upon the prestige of the judiciary. . . . Judges must assiduously avoid those contacts which might create even the appearance of impropriety. . . . *In the Matter of Lonschein,* 50 N.Y.2d 569, 572, 408 N.E.2d 901, 430 N.Y.S.2d 571 (1980). The duty to avoid creating an appearance of impropriety is one of taking reasonable precautions to avoid having a negative effect on the confidence of the thinking public in the administration of justice. *In the Matter of Bonin,* 375 Mass. 680 [707, 378 N.E.2d 669] (1978). *In re Inquiry Concerning a Judge,* 788 P.2d 716, 723 (Alaska 1990); see also *Liljeberg* v. *Health Services Acquisition Corp.,* 486 U.S. 847, 859–61, 108 S. Ct. 2194, 100 L. Ed. 2d 855 (1988).

"The second proposition is that an inquiry into disqualification of a judge requires a sensitive evaluation of all the facts and circumstances in order to determine whether a failure to disqualify the judge was an abuse of sound judicial discretion. *Bonelli* v. *Bonelli,* supra, 214 Conn. 22. In undertaking such an evaluation, we must be mindful of its intrinsic difficulties. Judges who are asked to recuse themselves are reluctant to impugn their own standards. Likewise, judges sitting in review of others do not like to cast aspersions. Yet drawing all inferences favorable to the honesty and care of the judge whose conduct has been questioned could collapse the appearance of impropriety standard . . . into a demand for proof of actual impropriety. *United States*

v. *Jordan,* 49 F.3d 152, 157 (5th Cir. 1995)." (Internal quotation marks omitted.) *Abington Ltd. Partnership* v. *Heublein,* supra, 246 Conn. 822–24.

The facts here demonstrate that the habeas judge heard evidence during pretrial discovery and received information from the petitioner's special public defender that Dixon may have misappropriated funds from the estate of the petitioner's father, which he referred to the grievance committee and to the chief state's attorney. During the first day of trial, before the commissioner had an opportunity to cross-examine the witness, the habeas judge concluded that Dixon had taken the petitioner's money. Although he failed to pursue it, Dixon filed a grievance against the habeas judge. After he received information that the state's attorney was not going to pursue criminal allegations against Dixon, the habeas judge communicated with the prosecutor assigned to the matter and demanded to know why. By his own admission, the habeas judge acknowledged that he may have pressed the prosecutor too hard.

I have no doubt that the habeas judge was certain that he could be impartial in the face of these facts, and I also believe that the other trial judges who considered or reviewed the commissioner's motions to recuse fairly thought that the habeas judge could remain impartial. What the judges thought, however, is not the applicable standard. The standard is whether there is an appearance of partiality.

Although the habeas judge had a responsibility to report the information given to him by the special public defender concerning Dixon's possible misappropriation of the petitioner's funds; see Code of Judicial Conduct Canon 3 (b) (3);[5] his duty ended there and he should

---

[5] Canon 3 (b) (3) provides: "A judge should take or initiate appropriate disciplinary measures against a judge or lawyer for unprofessional conduct of which the judge may become aware. A judge is not required to disclose information gained by the judge while serving as a member of a committee

not have made further inquiries or questioned the scope of the investigation conducted by the state's attorney. The comments the judge made at the end of the first day of trial and in questioning the thoroughness of the investigation done by the state's attorney,[6] no matter what explanation he provided after the fact, created the appearance of impropriety. Because the habeas judge failed to recuse himself, the appearance of impropriety tainted the entire proceeding, and the commissioner was deprived of an impartial fact finder. See Code of Judicial Conduct Canon 3 (c) (1).

I would reverse the judgment and grant a new trial.

that renders assistance to ill or impaired judges or lawyers or while serving as a member of a bar association professional ethics committee."

[6] Although the majority notes that the habeas judge was invited to telephone the assistant state's attorney, such an invitation does not obviate the need for the habeas court to appear impartial.