STATE OF CONNECTICUT *v.* CHARLES SPELLS
(AC 22730)

Flynn, West and Hennessy, Js.

Argued November 19, 2002—officially released April 8, 2003

*Louis S. Avitabile*, special public defender, for the appellant (defendant).

*Ronald G. Weller*, assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's attorney, and *John J. Davenport*, assistant state's attorney, for the appellee (state).

*Opinion*

WEST, J. The defendant, Charles Spells, appeals from the judgment of conviction, rendered after a jury trial, of three counts of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4), and one count of conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134 (a) (4). On appeal, the defendant claims that the trial court improperly (1) refused to grant his request for a continuance, in violation of his constitutional right to a fair trial and in abuse of its discretion, (2) denied his motions for a new trial and to reargue, and failed to recuse itself sua sponte from considering the motions, (3) denied his motion to suppress his statement to the police, and (4) refused to instruct the jury to find him not guilty on count two of the information and denied his postverdict motion for a judgment of acquittal on that count. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On October 20, 2000, the defendant and an accomplice entered the Cumberland Farms convenience store on Watertown Avenue in Waterbury. Both men were

dressed in black and wore masks to conceal their identities. The taller man carried a shotgun, and the defendant carried a handgun. The men took $400 from the cash register. The defendant ordered a customer, Edgar Sandoval, to give him his money. When Sandoval did not respond quickly enough, the defendant struck him with the handgun and took the man's wallet from his trousers. The defendant became angry because the wallet contained only $2 and threw it to the floor.

The taller man ordered the clerk to open the store safe. The clerk, however, did not have the key to the safe. The defendant told his accomplice to shoot the clerk. Lesley Sandoval, another customer, was scared. She gave the defendant the keys to her motor vehicle and informed him that there was more than $300 in the vehicle. The two men took the keys and left in the Sandoval vehicle.

The clerk and Edgar Sandoval could not identify the perpetrators of the crime because the men were wearing masks. They, however, provided general descriptions of the men. Both were African-American. One was about five feet, seven inches tall and in his midtwenties; the other was approximately six feet tall. These descriptions fit the defendant and his accomplice, respectively. The police found the Sandoval vehicle abandoned in a nearby parking lot and Lesley Sandoval's purse in a nearby street. More than $300 in cash and a laptop computer were missing from the vehicle. The police also found a black neoprene mask that contained several strands of head hair in the vehicle.

On October 24, 2000, the police received a telephone call that led them to consider the defendant a suspect in the case. The police found the defendant at his apartment. He agreed to accompany them to the police station, where he confessed to the crime and implicated

James Butler as his accomplice.[1] In giving his statement to the police, the defendant provided details of the crime of which only a participant would be aware. He knew where the Sandoval vehicle had been abandoned and told the police that the keys had been thrown into a wooded area behind the vehicle. The police subsequently found the keys where the defendant said they would be. Later that day, the police executed a search warrant of the defendant's apartment and found several black masks. One of the masks was identified by Edgar Sandoval as being similar to the one worn by the person who had robbed and assaulted him. After the defendant gave the police officers his statement, he accompanied and directed the officers to a residence where he believed Butler could be found. The defendant voluntarily provided samples of hair from his head to be compared with the hair found on the mask.

I

The defendant's first claim is that the court, *Damiani, J.*, abused its discretion and denied him his constitutional right to due process and a fair trial by denying his request for a continuance so that scientific testing could be conducted of various samples of human hair. We disagree.

The following facts are relevant to the defendant's claim. On March 20, 2001, the defendant filed a motion for a speedy trial pursuant to the statute applicable to sentenced prisoners having charges pending against them. See General Statutes § 54-82c. The jury for the defendant's trial was selected on May 11, 2001. At that time, the prosecutor informed the venire panel that personnel from the state crime laboratory would testify

---

[1] Butler was arrested on October 30, 2000, and subsequently confessed to the crime and implicated the defendant.

about hair samples taken from the neoprene mask, the defendant and Butler. The prosecutor informed defense counsel that the results of the testing would be made available as soon as possible and before the defendant's motion to suppress was to be argued on May 18, 2001.

On May 14, 2001, the prosecutor informed defense counsel that he had just learned that the hair found on the mask and the hair sample provided by the defendant had not been sent to the state crime laboratory because the police had failed to obtain a search warrant for a sample of Butler's hair.[2] On May 15, 2001, defense counsel filed a motion to dismiss or, in the alternative, for sanctions against the state for disclosing, after jury selection, that there was no scientific evidence that would demonstrate that the hair found on the mask in the Sandoval vehicle "did not belong to either the defendant or Butler."

The court held a hearing on the defendant's motion and denied the motion to dismiss. The court stated that the prosecutor would have to try the case without the results of the scientific testing because the defendant had filed a speedy trial motion and that the court would not delay the trial. The court imposed no alternative sanctions on the state.

Defense counsel then requested a continuance to have the comparative testing performed on the samples of hair obtained from the defendant, Butler and the mask at the expense of the public defender's office. The court questioned whether it could order Butler to submit a sample of his hair without the state's making that request in the case against Butler as required by our rules of practice.[3] Noting that there was not enough

---

[2] The November 1, 2000 police report indicates that the police would obtain a search warrant to obtain a sample of Butler's head hair.

[3] Butler's defense counsel was present and indicated that Butler would voluntarily provide a hair sample for complete DNA testing.

time to obtain DNA testing of the samples, the court denied the defendant's motion for a continuance.

The defendant renewed his motion for a continuance, arguing that DNA testing was not needed and that microscopic testing alone could determine whether the hair on the mask matched the defendant's or Butler's type of hair. He stated that the hair from the mask appeared to be Negroid head hair and that the defendant was a mulatto with Caucasian head hair. The court ordered the state to determine whether the hair on the neoprene mask was Negroid or Caucasian. The court denied the defendant's renewed motion for a continuance.

On May 18, 2001, after the state had rested its case-in-chief, the results of a microscopic examination became available. The results indicated that the sample from the mask was Negroid hair and that the defendant's hair was Caucasian.[4] Counsel stipulated that evidence of the test results would be presented to the jury. After the defense rested, the prosecutor informed the jury that the hair found on the neoprene mask was Negroid and that the defendant's hair was Caucasian.[5]

During its deliberations, the jury sent a note to the court, asking for instructions about how to consider

[4] A sample of Butler's hair later was submitted to the state crime laboratory and determined to be Negroid, but dissimilar to the Negroid hair found on the neoprene mask.

[5] The prosecutor stated in relevant part: "[D]uring the course of testimony, there was evidence that head hair was recovered from state's exhibit two, a foam mask. The state stipulates to that fact. That we also stipulate that [the defendant] did consent and did give hair samples to the Waterbury police department, [as] has been previously testified to, and that those hair samples were sent to the state police lab in Meriden, Connecticut, and . . . the forensic lab has concluded that the hair that's found in the mask is Negroid type head hairs, and that the hair samples from [the defendant] are human, Caucasian type of hairs. So that the hairs of [the defendant] do not match that of the foam mask, and that is our stipulation, and that the document documenting it, is an exhibit."

the inconsistencies in the defendant's signed statement.[6] The jury subsequently convicted the defendant.

On June 14, 2001, the police gave a sample of hair from Butler's head to the state crime laboratory. The crime laboratory issued a report on June 18, 2001, stating that the hair from the neoprene mask was Negroid and that Butler has Negroid hair. The hair samples, however, were otherwise dissimilar.

At trial and on appeal, the defendant argued that his statement and Butler's statement implicating one another were not trustworthy. The defendant contended that he fabricated his statement to make the police happy. At trial, there was testimony that an individual the size of the defendant had struck Edgar Sandoval. In the defendant's statement, he indicated that Butler had hit Sandoval. The state argued that the defendant had switched his role with Butler's to minimize his culpability.

On appeal, the defendant claims that he was denied a fair trial due to surprise as a result of the state's announcing that it would not present evidence of the comparative testing of the human hair samples. He argues that his request for a continuance was timely because a trial commences with jury selection and, therefore, his request for a speedy trial would not be implicated by the continuance. He also argued that there was time to conduct the tests before the end of the 120 day speedy trial requirement because Butler had volunteered to provide a hair sample. Because there was no evidence comparing Butler's hair with the hair

---

[6] The note from the jury stated: "If the *voluntary statement* that [the defendant] has signed is the *only* piece of evidence that we are considering for our decision, and the [prosecutor] has said that [the defendant] was not truthful in this statement—are there any special instructions as to the way we read this? Could one sentence that he took part in this robbery and no other evidence provided to us whatsoever be enough to convict." (Emphasis in original.)

from the neoprene mask, the state was able to argue that the hair from the mask was Butler's. Furthermore, the defendant's request for a continuance did not come as a surprise, as it was predicated on the state's disclosure that the test results were not available. Finally, the defendant referred to the difficulty the jury had interpreting his voluntary statement and claims that evidence that the hair on the mask was not his or Butler's would have indicated that he falsely had placed himself at the crime scene.

"A motion for continuance is addressed to the discretion of the trial court and its ruling will not be overturned absent a showing of clear abuse of that discretion. . . . In our review of the trial court's ruling on a motion for continuance, [e]very reasonable presumption in favor of the proper exercise of the trial court's discretion will be made. . . . It must be shown that the trial judge acted arbitrarily and substantially impaired [the] defendant's ability to defend himself, before an appellate court will conclude that the trial judge abused his discretion. . . . Our assessment of the reasonableness of the trial court's exercise of discretion is limited to a consideration of those factors on the record known to the court at the time it rendered a decision." (Citations omitted; internal quotation marks omitted.) *State* v. *Wegman,* 70 Conn. App. 171, 174–75, 798 A.2d 454, cert. denied, 261 Conn. 918, 806 A.2d 1058 (2002).

There are several factors to be considered when deciding whether the court abused its discretion when ruling on a motion for continuance. Such factors include "the likely length of the delay; the age and complexity of the case; the granting of other continuances in the past; the impact of delay on the litigants, witnesses, opposing counsel and the court; the perceived legitimacy of the reasons proffered in support of the request; the defendant's personal responsibility for the timing

of the request; [and] the likelihood that the denial would substantially impair the defendant's ability to defend himself . . . . Another set of factors has included, as part of the inquiry into a possible abuse of discretion, a consideration of the prejudice that the defendant actually suffered by reason of the denial of the motion for continuance." (Internal quotation marks omitted.) Id., 175–76.

Here, the defendant, due to his status as a prisoner, filed a motion for a speedy trial. The state had indicated during jury selection that it intended to introduce scientific evidence concerning the type of hair found on the neoprene mask as compared with the type of hair the defendant and Butler have. Unbeknown to the state, the police had never obtained a sample of Butler's hair, and no forensic testing had been done on any of the samples. The defendant hoped that the testing of the hair samples would prove that neither he nor Butler had worn the mask. By the same token, the state had hoped to have evidence that Butler's hair was on the mask.

The defendant faults the court for not granting a continuance to enable him to perform testing on a sample of hair from Butler. As the court indicated to the defendant at the hearing, it did not have the authority to order Butler to submit a hair sample sua sponte. The state had not made that request in Butler's case. See Practice Book § 40-33.[7] Furthermore, Butler's counsel

[7] Practice Book § 40-33 provides in relevant part: "*Upon application of the prosecuting authority,* the judicial authority by order may direct a law enforcement officer to bring the defendant forthwith before the judicial authority for an immediate hearing on a motion made under Sections 40-32 through 40-39, if an affidavit or testimony shows that there is probable cause to believe that the evidence sought will be altered, dissipated, or lost if not promptly obtained. . . ." (Emphasis added.)

Practice Book § 40-32 provides: "*Upon motion of the prosecuting authority,* the judicial authority by order may direct a defendant to participate in a reasonably conducted procedure to obtain nontestimonial evidence, if the judicial authority finds probable cause to believe that:

"(1) The evidence sought may be of material aid in determining whether

agreed to submit samples of his hair for full DNA testing, not merely microscopic testing, and there was not enough time for DNA testing.

At the time the court ruled on the motion for a continuance, the results of the tests performed on the samples of hair from the neoprene mask and the defendant were not available to the court. The court is not prescient and in no way could have anticipated the results. In a similar fashion, there is no way that the court could have anticipated the question from the jury regarding the defendant's statement.

Finally, the defendant has not demonstrated that the court's ruling was prejudicial to him. The defendant was not convicted because the results of the testing on the hair samples were unavailable. The results of the testing performed on the hair samples would have proved only that the hair found on the neoprene mask was not the defendant's and that it was not Butler's. The defendant was convicted on the basis of the statement he gave to the police.

At the time the defendant gave his statement, he was aware that the police had found a mask in the Sandoval vehicle and had a video surveillance tape of the robbery. When the defendant gave his statement, he provided information that only a participant in the crime could have known. The defendant confessed to the robbery and told the police that Butler was his accomplice. He also told the police that he and Butler wore masks, where the keys to the Sandoval vehicle could be found, how many people were in the store, that someone was assaulted and how much money was taken from the register. A jury may be permitted to infer certain facts

the defendant committed the offense charged; and

"(2) The evidence sought cannot practicably be obtained from other sources." (Emphasis added.)

from the evidence presented. See *State* v. *Middlebrook*, 51 Conn. App. 711, 720–21, 725 A.2d 351 (" '[o]nce the evidence is admitted, if it is sufficient for a jury to infer from it that the defendant had a consciousness of guilt, it is proper for the court to instruct the jury as to how it can use that evidence. It is then for the jury to consider any ambiguity' "), cert. denied, 248 Conn. 910, 731 A.2d 310 (1999).

We conclude that the defendant was not prejudiced by the court's denial of his motion for a continuance. The court, therefore, did not abuse its discretion or deny the defendant his constitutional rights to due process and a fair trial.

## II

The defendant's second claim is that the court, *O'Keefe, J.*, improperly denied his motions for a new trial and to reargue, and failed to recuse himself, sua sponte, from considering the motions. We disagree.

## A

We will first address the defendant's claims related to the motions for a new trial and to reargue. After the jury returned its verdict, the defendant filed a motion for a new trial, claiming that he was materially injured because he was not allowed to present evidence to the jury that several strands of hair found on the neoprene mask were not Butler's. The court refused to grant a continuance of the hearing on the postverdict motions until the results of tests performed on Butler's hair sample were available. Defense counsel argued that the evidence regarding Butler's hair was important for the jury to consider the defendant's claim that he had made a false confession because his will was overborne by the police, and that the defendant and Butler, in fact, had not participated in the burglary. According to the

defendant, he named Butler because the two men were not getting along at the time he confessed.

The court denied the motions for a continuance and for a new trial, stating in relevant part that "my impression from the evidence, the conclusion that I reached, was that he truthfully confessed to the participation in the robbery, but lied about certain aspects of the robbery, including his role in the robbery. I think he switched around . . . who was the aggressor, and he may have even named a false accomplice, but the court's impression was that he correctly named himself as the robber, but lied in certain aspects of the confession to . . . lessen his culpability." The court, however, also ruled that the defendant could file a motion to reargue his motion for a new trial if the hair analysis demonstrated that the hair on the neoprene mask was not Butler's.

The results of the test demonstrated that the hair on the neoprene mask were Negroid and that Butler's hair was Negroid, but also that the hair samples were dissimilar in other respects. The defendant filed a motion to reargue his motion for a new trial.

The court held a hearing on the motion to reargue on November 8, 2001, at which time defense counsel made arguments similar to those already discussed. The court denied the motion to reargue stating, "I presided over the case. I listened to the evidence. I'm familiar with the case. And the fact that the hair in this mask was not Mr. Butler's does not in any way undermine the strength of the state's case against [the defendant]. If the jury had known that, I don't know what conclusions they would have drawn based on it. But not the ones that [defense counsel is suggesting]. I think that anybody could have had this mask on before Butler used it and left their hairs there. I don't know what . . . the presence of someone's hair in the mask means.

I know what it doesn't mean. It does not mean that [the defendant] is innocent. And that's for sure."

As he did at the hearing, the defendant argued, on appeal, that he was materially injured by the state's asking the jury to infer that the hair on the mask was Butler's because Butler, an African-American, was the same height as the second robber and the hair on the mask was Negroid.[8] Consequently, the state asked the jury to infer that the defendant's confession that he and Butler had committed the robbery was true. The defendant also argued that because he did not have the test results at the time of trial, he could not argue to the jury that the hair found on the neoprene mask did not match his or Butler's type of hair, and, therefore, the defendant's confession must have been unreliable. Furthermore, he argued that he was entitled to a new trial by a jury, rather than having the court decide his guilt in the context of the motion to reargue, because the court had information that was not available to the jury.[9]

"Appellate review of a trial court's decision granting or denying a motion for a new trial must take into account the trial judge's superior opportunity to assess the proceedings over which he or she has personally presided. . . . Thus, [a] motion for a new trial is addressed to the sound discretion of the trial court and is not to be granted except on substantial grounds. . . . In our review of the denial of a motion for [a new trial], we have recognized the broad discretion that is vested in the trial court to decide whether an occurrence at

---

[8] During final argument to the jury, the prosecutor stated in relevant part: "And it's uncontroverted Mr. Butler's an African-American, and we would expect he has Negroid hair. And so I can't tell you it's Mr. Butler's hair. I can't tell you it's anybody else's hair. I can tell you that's the type of hair on there."

[9] We note that the court always has information that is not available to the jury.

trial has so prejudiced a party that he or she can no longer receive a fair trial. The decision of the trial court is therefore reversible on appeal only if there has been an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Whipper*, 258 Conn. 229, 247, 780 A.2d 53 (2001).

The sum and substance of the defendant's argument is that the results of the tests comparing the hair samples from the neoprene mask and from Butler were not available to him at trial. Evidence proving that the hair found on the mask was not Butler's would not have proved that the defendant did not participate in the robbery. As the court pointed out, the hair on the mask could have come from anywhere, and the fact that it was not similar to Butler's hair does not mean that Butler did not wear the mask. The defendant was convicted on the strength of the details about the robbery that he provided in his written statement. The court, therefore, did not abuse its discretion in denying the defendant's motions for a new trial or to reargue.

B

We now address the defendant's claim that Judge O'Keefe improperly failed to recuse himself, sua sponte, from deciding the defendant's motion for a new trial. The state has argued that we should not review the claim because the record is inadequate and the defendant failed to preserve his claim for appellate review. We agree with the state.

The claims arise from the court's apparent response to the defendant's disruptive behavior in the courtroom. After returning its verdict, the jury was excused so that the state could prepare to present evidence on part B of the information, which alleged that the defendant was a persistent dangerous felony offender under General Statutes § 53a-40 (a) (1) (A). The transcript of the court proceedings contains the following parenthetical

statement: "(physical outburst by the defendant)." The transcript then indicates that the state withdrew the part B information. Immediately thereafter, the court set the date for sentencing.[10]

Despite his assertion of certain acts by the court, the defendant did not file a motion asking the trial judge to recuse himself from the case, or seek to construct a record of the incident or ask for a hearing to determine whether the incident prevented the court from being fair and impartial in subsequent proceedings. The burden is on the appellant to provide an adequate record for review. See *State* v. *Collic*, 55 Conn. App. 196, 209, 738 A.2d 1133 (1999). "Any factual disputes involved in a claim of judicial bias may require an evidentiary hearing and, if so, it should be conducted before another judge." *Joyner* v. *Commissioner of Correction*, 55 Conn. App. 602, 608, 740 A.2d 424 (1999). We therefore decline to consider any portion of the defendant's claim as it relates to the court's response to his disruptive behavior immediately after the jury returned its verdict. The only information about the event that the transcript reveals is the parenthetical notation.

The court sentenced the defendant on July 30, 2001.[11] Prior to sentencing, while the prosecutor was addressing the court with the state's sentencing recom-

---

[10] The appendix to the defendant's appellate brief contains a photocopy of a newspaper article about the incident. Newspaper articles that have not been admitted into evidence or made part of the trial court file, do not constitute a record for appellate review. The subject article was never offered into evidence or mentioned at the hearing on the motion for a new trial. See *State* v. *Shanks*, 34 Conn. App. 103, 110, 640 A.2d 155, cert. denied, 229 Conn. 921, 642 A.2d 1216 (1994); see also Practice Book § 67-4 (d) (4) ("[w]hen error is claimed in any other ruling in a court or jury case, the brief or appendix shall include the pertinent motion or pleading as well as any other pertinent documents *which are a part of the trial court case file* but are not included in the record" [emphasis added]).

[11] On that date, prior to sentencing, the court denied the defendant's motions for a continuance, for a judgment of acquittal and for a new trial.

mendation,[12] the defendant spat on him. After a brief recess during which the defendant was removed from the courtroom, the court stated on the record: "All right. Just so the record is clear, just so the record is clear— upon the conclusion of the prosecutor's remarks, the defendant turned toward the prosecutor and spit in his face, and at that point, the defendant was removed by order of the court. And I'll allow the sentencing to continue. The defendant can hear our remarks through the communication system. . . . I feel very badly for the sheriffs to have to deal with somebody like this. I feel very badly for [the prosecutor] who is a dedicated, hardworking public servant, just trying to do his job, and he does it well, trying to protect law-abiding citizens from people like [the defendant]. And to have to put up with this is disturbing. When I was a prosecutor, I was subject to threats and also disrespectful behavior by the defendants in court, and it's bothersome. I'm sorry. I feel badly for you." The defendant did not object to the court's remarks.[13] The court proceeded to imposed an effective sentence of forty-five years in

---

[12] The state recommended that the defendant receive an effective sentence of fifty-two years.

[13] The defendant also cited the following colloquy between him and the court made during his allocution, but failed to explain why it is relevant to his argument on appeal:

"[The Defendant]: First of all, I want to let you know that nothing I did in your courtroom, I don't regret nothing, none of it.

"The Court: You don't what?

"[The Defendant]: I don't regret none of it.

"The Court: Good. I don't regret it, either. It's nothing.

"[The Defendant]: As far as any of you all judging me, you so-called judging me or taking my life, taking me from my family, you all is not right. But you think you are doing your job, but this is not a job, this is what you are doing now. You are really hurting a lot of people's lives whether you realize it or not. You think this is a job, you think this is what you are doing, justice. You got no right to judge nobody. What you are doing now, you are going to have to deal with this. And whatever how much time you give me, when I get out, you are going to be dead. I'm still going to be alive, and you got to go to judgment then. Believe that."

prison consecutive to the sentence the defendant then was serving.

On appeal, the defendant claims that after sentencing him, the trial judge should have recused himself, sua sponte, and referred the motion for reargument of the defendant's motion for a new trial to another court.[14] At no time did the defendant ask the judge to recuse himself. The defendant bases his claim on the incident involving his disruptive behavior at the time the jury rendered its verdict. As we have previously held, we have no record of the incident to which the defendant refers and decline to review his claim.

The defendant also claims that the court's remarks on the record after the defendant spat on the prosecutor are evidence of bias in favor of the prosecutor and judicial marshals, thereby requiring the judge to recuse himself.[15] The defendant relies on canon 3 (c) (1) (A) of the Code of Judicial Conduct for his claim that the court's comments created the appearance of impropriety.[16] "It has long been settled that the bias or prejudice sufficient to result in a disqualification must stem from an extra-judicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." (Internal quotation marks omitted.) *Joyner* v. *Commissioner of Correc-*

[14] The defendant, however, does not claim that the judge should have recused himself from sentencing him.

[15] The defendant concedes that it was not improper for the court to sentence the defendant pursuant to the jury's verdict. The defendant argues only that it was improper for the judge to fail to recuse himself from deciding his motion for a new trial.

[16] Canon 3 (c) (1) of the Code of Judicial Conduct provides in relevant part: "A judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:

"(A) the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding . . . ."

*tion*, supra, 55 Conn. App. 608–609. In his brief, the defendant has failed to explain how or why the court's comments to the marshals and the prosecutor in the face of the defendant's spitting on the prosecutor, an abusive, disrespectful and unsanitary act, were improper. The court observed the defendant's abusive behavior in the courtroom during sentencing.

In the context of adjudicating a criminal contempt, our Supreme Court has set forth the role of the judge in the administration of justice and the dignity of the office, as well as that of the court.[17] See *In re Dodson*, 214 Conn. 344, 572 A.2d 328, cert. denied sub nom. *Dodson* v. *Superior Court*, 498 U.S. 896, 111 S. Ct. 247, 112 L. Ed. 2d 205 (1990). Our view of the record indicates that the defendant's behavior was "directed against the dignity and authority of the court as an institution and not against the trial judge personally." (Internal quotation marks omitted.) Id., 358. The court's comments were addressed to the defendant's behavior, which "was not a mere affront to the sensibilities of the trial judge qua trial judge; it directly hindered and interfered with the Superior Court qua Superior Court in its orderly processing of business before it. This misconduct led to obstruction and delay and was directed against the dignity of the court." Id., 360.

We conclude, therefore, that there was no reason for the judge to recuse himself for having made a statement on the record in recognition of the difficult tasks performed by the judicial marshals and the prosecutor in the face of the defendant's disruptive behavior. Furthermore, the remarks were made in the context of explaining why the defendant had been removed from the courtroom during his sentencing and did not create the appearance of impropriety.

---

[17] The court, here, did not find the defendant in criminal contempt.

## III

The defendant's third claim is that the court, *O'Keefe, J.*, improperly denied his motion to suppress his statement to the police. The defendant claims that he did not knowingly, voluntarily and intelligently waive his rights pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). We do not agree.

The defendant filed a motion to suppress the statement he gave to the police about the robbery at the Cumberland Farms convenience store. The court held a hearing on the matter at which Eugene Coyle, a detective in the Waterbury police department, testified about the manner in which the police had obtained the defendant's statement. On October 24, 2000, the defendant voluntarily accompanied the police to the police station. Coyle presented the defendant with a computer generated constitutional rights form and read him his rights. After Coyle read the defendant each of his rights, the defendant initialed the form next to each enumerated right. During his argument to the court that the statement should be suppressed, the defendant noted that he had not affirmatively given a knowing and intelligent waiver of his rights because he had failed to circle either the word "yes" or "no" in response to the questions, "Do you understand these rights?" and, "Are you willing to waiver (give up) these rights and answer my questions?" Instead of circling his answers, the defendant wrote his initials next to the questions. The defendant signed and dated the form. The constitutional rights form was admitted into evidence.

Immediately after the defendant signed the rights form, he gave Coyle a written statement, which the defendant also had signed. The statement was admitted into evidence. Directly above the defendant's signature are the printed words, "I have given the above statement of my own free will without threat or promise after

my Constitutional Rights have been explained to me." When he testified during the suppression hearing, the defendant did not claim that he did not understand his constitutional rights, but that he waived them after he had returned from showing the police where they might find Butler. In other words, the defendant claims that he gave Coyle a statement before Coyle obtained his consent.

In denying the defendant's motion to suppress, the court made the following findings. The interview was taken "in a relatively relaxed setting, with no evidence of duress or promises or threats, and the defendant was informed of his rights. . . . And an advisement is in evidence and I've looked at it, and it's obvious there was an omission on the part of the—either the police or the defendant to circle a portion of the form, but the other evidence, the other pertinent evidence fills in the gaps. And based on the totality of the entire picture presented to the court, I find that there was a waiver, and that it was knowing and intelligent and voluntary, and that determination is not affected by the apparent incompleteness of the form. After the advisement and the waiver, the defendant spoke freely of the robbery and his other knowledge of the subsequent robbery." The court credited the testimony of Coyle, rather than that of the defendant.

"The standard of review for a trial court's ruling on a motion to suppress is well settled. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record. . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . . [O]ur review is plenary and we must determine whether the trial court's conclusions of law are legally and logically correct and find support in the stipulated facts."

(Citation omitted; internal quotation marks omitted.) *State* v. *Rivera*, 74 Conn. App. 129, 143–44, 810 A.2d 824 (2002).

"[T]he test of voluntariness is whether an examination of all the circumstances discloses that the conduct of law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined . . . . The ultimate test remains . . . . Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. . . . [W]e review the voluntariness of a confession independently, based on our own scrupulous examination of the record. . . .

"We make such a determination by examining the totality of the circumstances surrounding the confession, and determining whether the confession [was] the product of an essentially free and unconstrained choice by the maker. . . . Factors that may be taken into account, upon a proper factual showing, include: the youth of the accused; his lack of education; his intelligence; the lack of any advice as to his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food and sleep." (Citations omitted; internal quotation marks omitted.) *State* v. *Edward B.*, 72 Conn. App. 282, 289–90, 806 A.2d 64, cert. denied, 262 Conn. 910, 810 A.2d 276 (2002).

The defendant makes no claim that he was held in lengthy detention or subjected to physical punishment. The defendant voluntarily accompanied the police to the police station and was not handcuffed. On the basis of our review of the record, we conclude that at the

time he gave his statement to the police, the defendant was well acquainted with the criminal justice system. His testimony reveals him to be articulate and knowledgeable. The court concluded that his testimony that he was not informed of his constitutional rights until after he had given the police a statement was not credible. The defendant testified that he was not informed of his constitutional rights until after he had returned from showing the police where they might find Butler. While the defendant was pointing out where Butler might be found, his defense attorney telephoned Coyle and discussed the defendant's waiver and statement. When the defendant returned to the police station, he signed a form permitting the police to take a sample of his hair.

We therefore conclude that the court properly denied the defendant's motion to suppress.

## IV

The defendant's last claim is that the court, *O'Keefe, J.*, improperly refused to instruct the jury to find the defendant not guilty of the second count of the information, which charged him with robbery in the first degree, and denied his motion for a judgment of acquittal as to that count because there was insufficient evidence to convict him of having robbed Edgar Sandoval. We are not persuaded.

Count two of the information charged the defendant with robbery in the first degree in violation of § 53a-134 (a) (4),[18] alleging that he had used or threatened

---

[18] General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm . . . ."

General Statutes § 53a-133 provides: "A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing

the immediate use of physical force on Edgar Sandoval for the purpose of preventing or overcoming resistance in the taking of Sandoval's property. As we stated at the beginning of this opinion, the defendant had struck Sandoval with his handgun and removed the man's wallet from his trousers. Because the wallet contained only $2, the defendant became enraged and threw the wallet to the floor.

"In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom, the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Meehan*, 260 Conn. 372, 377–78, 796 A.2d 1191 (2002).

At trial and on appeal, the defendant claims that he could not be convicted of having robbed Edgar Sandoval because he did not keep the man's wallet. This claim is misguided because the defendant misapprehends the intent necessary to commit robbery. This claim is controlled by our Supreme Court's holding in *State* v. *Anderson*, 212 Conn. 31, 561 A.2d 897 (1989). In *Anderson*, the defendant had used a knife to rob the victim, but moments after he took the money, he returned it to her. On appeal, the defendant claimed that he did not have the intent necessary to deprive the victim of her money because he returned it. Id., 45.

"In discussing the intent to deprive another of property, an element required for a conviction of robbery

or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny."

in the first degree, [our Supreme Court has] stated that the accused must *intend* both to take the property of another and to retain it. . . . The requisite intent for retention is permanency. . . . [S]ee General Statutes § 53a-118 (a) (3) (deprive means withhold [property] or cause it to be withheld from [the victim] permanently . . .). Intent, however, can be inferred both from the defendant's conduct and his statements *at the time of the crime* . . . and whether such an inference should be drawn is properly a question for the jury to decide. . . . To be convicted of robbery in the first degree, therefore, it is not necessary for the jury to find that the defendant actually kept the property in question, but rather, that at the moment he took the property he intended to retain it permanently. . . . Moreover, a postoffense change of heart is not a defense to a crime." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Anderson,* supra, 212 Conn. 45–46.

We have reviewed the evidence in the light most favorable to sustaining the verdict, and conclude that the jury reasonably could have found that the defendant took Sandoval's wallet and money with the intent to retain it permanently. The court, therefore, properly denied the defendant's request to charge and his motion for a judgment of acquittal.

The judgment is affirmed.

In this opinion the other judges concurred.