# STATE OF CONNECTICUT *v.* DEAN HOLLIDAY
## (AC 23568)

Schaller, West and McLachlan, Js.

Argued June 1—officially released September 28, 2004

*Deborah G. Stevenson*, special public defender, for the appellant (defendant).

*John A. East III*, senior assistant state's attorney, with whom, on the brief, were *Scott J. Murphy*, state's attorney, and *Paul N. Rotiroti*, assistant state's attorney, for the appellee (state).

*Opinion*

SCHALLER, J. The defendant, Dean Holliday, appeals from the judgment of conviction, rendered after a jury trial, of attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-49 and 53a-134 (a) (2), conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134 (a) (2), and attempt to commit robbery in the second degree in violation of General Statutes §§ 53a-49 and 53a-135 (a) (1). On appeal, the defendant claims that (1) there was insufficient evidence to support the conviction, (2) the trial court improperly admitted evidence of prior misconduct, (3) the court improperly admitted his statement to the police and (4) the prosecutor committed misconduct that resulted in a denial of the defendant's due process rights to a fair trial. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The defendant and his fiancee, Marisa Bones, operated a convenience store in Hartford that sold tobacco products. The business failed and, on April 4, 2001, the defendant was in the process of cleaning the retail store to sell the business. Between noon and 1 p.m. that day, the defendant, in Bones' car, drove to the Veterans Administration Federal Credit Union in Newington and parked in a no parking zone. Before entering the building, the defendant pulled the dust mask that he had used for cleaning over his face. He also wore latex gloves, heavy clothes and a backpack.

The defendant's appearance alarmed an employee, who contacted Diane Jarvis, the chief executive officer of the credit union. She approached the defendant, who lifted his mask slightly and asked if a person who was not a member of the credit union could cash a check. Jarvis told the defendant that he could not cash a check there, and the defendant thanked Jarvis and exited the building. The encounter lasted approximately forty-five seconds. The defendant then got into the car and left the area. Jarvis contacted the police to inform them of the defendant's suspicious behavior. Later that evening, the defendant called his friend, Hector Arriola, and expressed his low opinion of the credit union's security.

The next day, Jarvis told her employees to be prepared for trouble on the basis of the incident with the defendant the previous day. Meanwhile, the defendant met with Arriola at the defendant's store, and they proceeded to the credit union. Upon their arrival, they parked their car close to the credit union in a no parking zone. The credit union's door was propped open to cool the building, as it was a warm day. An employee of the credit union, Stacey Rechenberg, was walking to the front door and, contemporaneously, the defendant and Arriola got out of the car wearing latex gloves and dust masks. Rechenberg saw them and then saw the

defendant reach into the backseat of the car and remove a black bag. Cognizant of the earlier warning, Rechenberg slammed and locked the door. Another employee contacted Jarvis, who in turn activated the alarm and telephoned the police.

The defendant and Arriola fled the scene. The defendant drove at a high rate of speed toward West Hartford, proceeding through traffic signals, weaving through traffic and driving on the pedestrian walkway. Newington and West Hartford police responded, and pursued the defendant and Arriola into West Hartford, where they attempted to evade the police by entering an industrial area and then exiting the car and proceeding on foot. The change in tactics did not help the defendant and Arriola, however, as a police canine tracked the pair to a dumpster approximately two miles from the car. The police arrested the defendant and Arriola. The police then brought Jarvis, Rechenberg and another employee to the dumpster where they individually identified the defendant, Arriola and the car.

The defendant and Arriola were placed in separate police cars and taken to police headquarters. The police searched the car and the surrounding area. In the car, the police found two pairs of latex gloves, two dust masks, two duffel bags, a bag containing numerous smaller bags of marijuana totaling 22.5 grams, and a .22 caliber shell. At police headquarters, the defendant confessed that he knew that Arriola was planning to rob the credit union and that Arriola frequently carried a large military knife and a silver handgun. On the basis of that information, the police, with the defendant, reexamined the area where the car was discovered. The police recovered a silver, .22 caliber semiautomatic handgun near where the defendant and Arriola had left the car.

After that trip, the defendant was returned to police headquarters where he gave another statement. The

defendant admitted, inter alia, that (1) he had spoken to Arriola the previous night and told him that the security was "weak" and "lacking," (2) he and Arriola had driven to the credit union that morning, (3) he had provided the mask for Arriola, (4) Arriola had donned the mask and exited the car, (5) he had known that Arriola was going to rob the credit union, (6) when the employee closed the door to the credit union, he thought that they had been detected and that the police had been called, (7) he had fled from the credit union because the car had illegal marker plates and he and Arriola had marijuana, (8) in his flight from the police, he had broken several traffic laws and (9) his actions were "wrong."

In addition, the jury also reasonably could have found that on August 30, 1995, the defendant, wearing a nylon stocking over his head and carrying a BB gun, entered a West Hartford bank. He robbed the bank, using the BB gun to ensure the employees' compliance. After taking money and placing it in a backpack that he was carrying, he left the bank. The police caught the defendant later on the same day. The defendant confessed that he had robbed the bank to satisfy a debt to a Bridgeport drug dealer who had been threatening to harm him. That incident resulted in his conviction of robbery in the second degree and larceny in the first degree. The jury could have considered that evidence only when determining the defendant's intent. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant claims that there was insufficient evidence to support the conviction. The defendant's argument is that the state failed to prove all of the required elements of the crimes. We are not persuaded.

"The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Internal quotation marks omitted.) *State* v. *Elsey*, 81 Conn. App. 738, 743–44, 841 A.2d 714, cert. denied, 269 Conn. 901, 852 A.2d 733 (2004). "[T]he jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt." (Internal quotation marks omitted.) Id., 744.

"A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny." General Statutes § 53a-133. It is robbery in the first degree if, in the course of committing the robbery as previously described, the defendant or one of his accomplices, in the commission of the crime or in fleeing from it, "is armed with a deadly weapon . . . ." General Statutes § 53a-134 (a) (2). It is robbery in the second degree if the defendant "is aided by another person actually present . . . ." General Statutes § 53a-135 (a) (1).

"A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy." General Statutes § 53-48 (a).

"A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." General Statutes § 53a-49 (a).

The defendant's confession provided all the proof necessary to satisfy the elements of the charged crimes. The defendant spoke with Arriola about security and about meeting him in the morning of the robbery, which constituted the agreement for conspiracy. See *State* v. *Richardson*, 66 Conn. App. 724, 738, 785 A.2d 1209 (2001) (formal agreement need not be proved). The defendant and Arriola went to the credit union with masks, gloves, bags and a gun. They illegally parked and got out of their car near the credit union. Those actions constituted the substantial step necessary for an attempt and, moreover, fulfilled the requirements of robbery in the first and second degrees. In the context of harmless error analysis, our Supreme Court has "noted that a confession, if sufficiently corroborated, is the most damaging evidence of guilt . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Shifflett*, 199 Conn. 718, 752, 508 A.2d 748 (1986). We see no reason why that should not be the law when considering whether there was sufficient evidence to sustain the defendant's conviction. Here, the defen-

dant's confession was corroborated by the testimony of Jarvis, Rechenberg and the police officers and by the evidence of the recovered gun. Further, the jury, when determining whether the defendant had the relevant intent, could rely on his prior misconduct. There was sufficient evidence for the jury to find the defendant guilty of the charged crimes.

## II

The defendant claims that the court improperly admitted evidence of prior misconduct, specifically, the evidence regarding the 1995 robbery. The defendant argues that the prior misconduct was more prejudicial than probative and that it should not have been admitted.

"The admission of evidence of . . . uncharged misconduct is a decision properly within the discretion of the trial court. . . . [E]very reasonable presumption should be given in favor of the trial court's ruling. . . . [T]he trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done. . . . To be admissible under the Connecticut Code of Evidence, the uncharged misconduct must be relevant . . . to one of the exceptions . . . to the general bar against uncharged misconduct. . . . If it is relevant to one of the exceptions, then its probative value . . . must be greater than its prejudicial effect. . . . Section 4-5 (b) [of the Connecticut Code of Evidence] specifies that uncharged misconduct may be admissible to prove, inter alia, intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony." (Citations omitted; internal quotation marks omitted.) *State* v. *Dearborn*, 82 Conn. App. 734, 740–41, 846 A.2d 894, cert. denied, 270 Conn. 904, 853 A.2d 523 (2004).

The evidence was relevant to intent. In *State* v. *Amaral*, 179 Conn. 239, 244–45, 425 A.2d 1293 (1979), our Supreme Court stated: "Under a charge of possession with intent to sell, the fact that in the past the defendant had been a seller of the drug would tend to characterize the nature of his possession of the drug at the time of the alleged offense." Similar to the situation in *Amaral*, here, the fact that the defendant previously had robbed a bank would tend to characterize the nature of his actions outside the credit union on April 5, 2001, as a step toward his attempt to rob the credit union, rather than an innocent visit to the credit union.

The evidence also was more probative than prejudicial. The defendant argues that the similarity of the crimes made the prior misconduct more prejudicial than probative because the jury would be more likely to view the prior misconduct as propensity evidence. That argument is disposed of by cases such as *State* v. *Amaral*, supra, 179 Conn. 244, in which the mere fact that the prior misconduct and the charged crime are similar do not make the prior misconduct evidence overly prejudicial. The unique situation that took place outside the credit union on April 5, 2001, put a sharp focus on the defendant's intent and, as such, evidence that tended to show his intent was highly probative. Although some prejudice naturally flows from such evidence, that evidence was not the type of evidence that would shock the jury or inflame its passions. Further, any prejudice was minimized by the court's limiting instructions. The court did not abuse its discretion when it admitted the evidence of the defendant's prior misconduct.

III

The defendant next claims that the court improperly admitted his statement to the police. In his brief, how-

ever, the defendant argues that the court improperly denied his motion to suppress. The state responded to the defendant's brief and argued that the decision not to suppress was proper. As both parties have treated the issue as one of suppression, we will address it as such. We conclude that the court's decision was correct.

The following additional facts are necessary to resolve the defendant's claim. Prior to trial, the defendant filed a motion to suppress his confession. At the hearing, Officer Peter Lavery of the Newington police department testified that he had transported the defendant from where he initially was apprehended to police headquarters. When they arrived at headquarters, Lavery informed the defendant of his constitutional rights, and the defendant signed a waiver form. Lavery then placed the defendant in a holding cell. He never personally questioned the defendant.

The state then called Officer Brian Gallagher of the Newington police department, who was responsible for questioning the defendant. Gallagher observed Lavery reading the defendant his rights and the defendant signing the waiver form. Shortly thereafter, Gallagher spoke with the defendant, who agreed to give an oral and written statement. The defendant gave an oral statement to Gallagher, who then typed the statement, and allowed the defendant to make corrections and to sign the statement. Gallagher was with the defendant the entire time, and the defendant did not request an attorney. Gallagher explained that there were two interviews, each lasting approximately forty-five minutes. The defendant asked to call Bones twice, but the police would not let him contact Bones until the interviews were concluded. Both Gallagher and Lavery testified that at no time did anyone threaten the defendant or his family.

The court stated in relevant part: "Having heard evidence on the motion to suppress . . . and considering

the totality of the circumstances that I was privy to with the evidence, the court finds that adequate warnings were given to the defendant [and] that there was an intentional waiver or abandonment of his known right or privilege. It was a voluntary waiver.

"At no time did the defendant indicate that he was dissatisfied with what was going on. At no time did he feel that he was pressured. The voluntariness I'm talking about was based on the totality of the circumstances. There was no improper influence, and there were no promises or other inducements made to get the defendant to make his statement. I do find that the statement was a product of, essentially, free and unconstrained choice by the maker.

"I find that the duration and conditions of detention were not onerous. I find that the manifest attitude of the police toward the defendant was reasonable. I find that the physical and mental state of the defendant at all times was fine and also that there were no pressures set up which might sap or sustain the defendant's powers of resistance and self-control. . . . A lot of this decision is based on credibility. . . . I hereby deny the motion to suppress."

Our review of the court's decision is plenary. *State* v. *Spells*, 76 Conn. App. 67, 88, 818 A.2d 808 (" '[w]e review the voluntariness of a confession independently, based on our own scrupulous examination of the record' "), cert. denied, 266 Conn. 901, 832 A.2d 67 (2003). The defendant's argument consists solely of a wholesale attack on the court's factual findings. "The trial court's findings as to the circumstances surrounding the defendant's interrogation and confession are findings of fact . . . which will not be overturned unless they are clearly erroneous." (Internal quotation marks omitted.) *State* v. *Reyes*, 81 Conn. App. 612, 616, 841 A.2d 237 (2004). "A finding of fact is clearly errone-

ous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Commissioner of Transportation* v. *Bakery Place Ltd. Partnership*, 83 Conn. App. 343, 350, 849 A.2d 896 (2004). The underpinning of the defendant's assault of the facts relies exclusively on his testimony, which was completely contradictory to the police officers' accounts. The court credited the officers' testimony, "and we will not retry those credibility determinations on appeal." *State* v. *James*, 237 Conn. 390, 427, 678 A.2d 1338 (1996). The officers' testimony contains facts sufficient to support the court's factual findings. Because the court's factual conclusions were not clearly erroneous, the court's denial of the motion to suppress was proper.

## IV

The defendant's final claim is that his federal and state due process rights to a fair trial were violated as a result of numerous instances of prosecutorial misconduct. Specifically, the defendant argues that the prosecutor made several improper remarks when objecting and during closing arguments that caused substantial prejudice to the defendant. The defendant's alleged instances of prosecutorial misconduct fall into four categories of proscribed conduct: (1) improper comments by the prosecutor regarding the evidence, which amounted to unsworn testimony; (2) improper expression of the prosecutor's personal opinion regarding the credibility of the defendant and other witnesses; (3) improper expression of the prosecutor's opinion regarding the guilt of the defendant; and (4) improper comments by the prosecutor intended to cause the jury to view the defendant's counsel negatively. We address each category of misconduct in turn.

The following additional facts are necessary to resolve the defendant's claim. During trial, the prosecutor made the following objection during the cross-examination of Officer Gallagher, when defense counsel asked whether the defendant's rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), had ever been repeated to the defendant: "Objection, Your Honor. First of all, they don't need to be repeated to him, and he's trying to create the impression that they do. They don't. That's it." After the objection was overruled, the prosecutor objected a second time: "Objection. Once again, it's legally irrelevant. The West Hartford officer read it to him, then Officer Lavery read it to him. There is no legal requirement for him to be read them every time, every three seconds they speak with him. I object to that. It's not legally relevant, and he's trying to create the impression that it is." The court overruled the second objection. Defense counsel did not object to the prosecutor's statements.

During closing argument, the prosecutor began by providing a summary of the facts of the case: "On the fourth of April [2001, the defendant] goes to the [Veterans Administration Federal] Credit Union. Now, he goes to the credit union, and he's wearing a mask. He's wearing a surgical mask. He puts it over his face. He puts it over his face, and he then goes into the credit union where he asks only if he can cash a check. They say no, and he leaves. . . . The purpose of that, ladies and gentlemen—to use the vernacular—is to case the joint. . . . He came in wearing a surgical mask that first day to case the joint, see what the reaction was. When he saw there was no guard, when he saw no one bolted the door immediately, when he saw the police did not arrive, he concluded one thing. He concluded . . . the security was weak, something that you would only conclude if you were casing the joint and seeking to rob

the place." Defense counsel did not object to those statements.

At another point during closing argument, the prosecutor continued his summary of the case, stating: "And also, ladies and gentlemen, Stacy Rechenberg sees what's happening. They're very close by. She has a clear view of them. And what does she do? She slams the door. And she slams the door because Stacy Rechenberg is no dummy. She's an intelligent woman. She knew what was happening. She knew they were about to rob that place because nobody, as she testified, comes in wearing a surgical mask, and nobody has done that in her history at the credit union. And now two people were doing it." Defense counsel did not object to those statements.

Near the beginning of rebuttal argument, the prosecutor stated: "[W]e know that [the defendant] observed the security there that day because it's in his sworn statement . . . . And on this whole issue of, you know, you didn't have enough time and this and that and blah, blah, blah; all that stuff that [defense counsel] was saying, let me just say this, ladies and gentlemen, on that issue. [The defendant] went to—he was interviewed by the police at forty-five minute intervals; much else was happening that day. He was brought to the [police] station, in a cell for an hour, waited for an hour, talked to [Officer] Gallagher for forty-five minutes, later on in the day talked to Gallagher for forty-five minutes, but in between that, he was given food, he went to the scene, he was sitting there for a long time not doing much of anything.

"All of that happened, ladies and gentlemen. There was no pressure. There was no coercion. There was no threat to have Marisa Bones arrested or have their child taken away. There was no threat of any of that. There was no requesting of a lawyer. Ladies and gentlemen,

I submit to you none of that happened. And when you look at credibility, you've got to assess certain things. Who has an interest in this case to be untruthful? The defendant has an interest in this case to be untruthful. And the judge will charge you that a defendant's interest in a case because of the consequences he faces, his interest in the case is great and that should be considered by you in addressing his credibility." Defense counsel did not object to those statements.

At another point during rebuttal argument, the prosecutor stated: "So, let's just say this, the defendant himself said, 'I didn't have the mask on . . . I had it on my neck but not on my face.' But Stacy Rechenberg saw it on his face. Ask yourself this: Who would have a motive to be untruthful? Stacy Rechenberg or this defendant, who faces significant consequences? Stacy Rechenberg, the innocent, alert worker at the credit union or this defendant, who can face severe consequences? I submit to you the answer there is obvious who would have a motive to be untruthful." Defense counsel did not object to those statements.

The prosecutor also stated during rebuttal: "Now, he later comes up with this version when he testifies that he . . . left and then they smoked marijuana, and then they came back and then . . . they saw the police [and] then fled. Well, the problem with that, ladies and gentlemen, is that in his written statement he says . . . 'I heard the credit union front door slam. I got scared and panicked, thinking they had seen us and were going to call the police.' . . . So, at the time the door slams is the time he flees. . . . [I]n his statement, he says nothing about I went there and then I left on my own and then I came back and then I fled because cop cars were there and I had marijuana. . . . He fled because he had the mask, a gun in the car, he'd been there the day before, he communicated it to Arriola, the weak security, and he was going to rob the place and that's

why he fled. . . . He can't even get right the reasons he fled.

"In his sworn statement, he says, 'I ran from the police because I knew I had switched the marker plates on the car, and I didn't want to go back to jail.' . . . The problem with that is he says that in his sworn statement, but what does he say now? Now, he says it was marijuana. I fled because of marijuana. So, he's got all kinds of different reasons why he did the activity. I submit to you he can't even get his story straight." Defense counsel did not object to those statements.

At another point during rebuttal argument, the prosecutor stated: "So, I submit to you, ladies and gentlemen, what's more credible?. . . In terms of credibility, this defendant has a prior robbery conviction and a prior larceny conviction, and the court will instruct you that you can evaluate that in the credibility. Officer Gallagher has no criminal convictions. Stacy Rechenberg has no criminal convictions. Diane Jarvis has no criminal convictions. Danielle Gallagher had no criminal convictions. None of these people in this case have any criminal convictions except this defendant, and you can utilize that in evaluating [the] credibility of these witnesses." Defense counsel did not object to those statements.

Near the conclusion of rebuttal argument, the prosecutor stated: "Use your common sense, ladies and gentlemen, and scrutinize the testimony of these witnesses and determine what makes sense to you. You're smart people. You can scrutinize what these individuals say and what it means. Let me just talk about another thing briefly on scrutinizing witnesses. Diane Jarvis . . . the credit union manager. She has no motive to lie or be untruthful. . . . Who has the motive to be untruthful? Diane Jarvis or the man who had all the tools of the robbery with him and the intent to commit that robbery,

and had taken action toward committing it?" Defense counsel did not object to those statements. After closing arguments, the court instructed the jury that it should pay attention to the evidence and that the arguments of counsel were not evidence.

Conceding that the prosecutorial misconduct claim is unpreserved, the defendant seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Our Supreme Court, however, recently held that it is not necessary for a defendant to seek to prevail under the specific requirements of *Golding* in these circumstances. *State* v. *Stevenson*, 269 Conn. 563, 572–73, 849 A.2d 626 (2004). The court explained that "the touchstone for appellate review of claims of prosecutorial misconduct is a determination of whether the defendant was deprived of his right to a fair trial . . . ." (Citation omitted.) Id., 573. Instead of *Golding* analysis, the court explained, the determination must involve application of the specific prosecutorial misconduct factors articulated in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987), regardless of whether the defendant objected to the incidents of misconduct at trial. *State* v. *Stevenson*, supra, 573.

Accordingly, we engage in a two step analytical process when reviewing claims of prosecutorial misconduct. "The two steps are separate and distinct: (1) whether misconduct occurred in the first instance; and (2) whether that misconduct deprived a defendant of his due process right to a fair trial." (Internal quotation marks omitted.) *State* v. *Beaulieu*, 82 Conn. App. 856, 868, 848 A.2d 500, cert. granted on other grounds, 270 Conn. 908, 853 A.2d 524 (2004). "The defendant bears the burden of proving that the prosecutor's statements were improper . . . ." *State* v. *Brown*, 256 Conn. 291, 298, 772 A.2d 1107, cert. denied, 534 U.S. 1068, 122 S. Ct. 670, 151 L. Ed. 2d 584 (2001).

In the event we find that misconduct occurred, we must then determine the due process issue by applying the following *Williams* factors mandated by our Supreme Court: (1) the extent to which the misconduct was invited by defense conduct or argument; (2) the severity of the misconduct; (3) the frequency of the misconduct; (4) the centrality of the misconduct to the critical issues in the case; (5) the strength of the curative measures adopted; and (6) the strength of the state's case. *State* v. *Stevenson*, supra, 269 Conn. 573. In addition, defense counsel's failure to "object to one or more incidents of misconduct must be considered in determining whether and to what extent the misconduct contributed to depriving the defendant of a fair trial . . . ." Id., 576.

### A

We begin our analysis by first determining whether the prosecutor engaged in misconduct. The defendant's brief provides analysis of ten instances of alleged misconduct and also contains citations to the record of other instances of alleged misconduct that he has not briefed. We confine our review to the instances that have been briefed.

### 1

First, the defendant argues that the prosecutor engaged in misconduct by interjecting improper comments regarding the evidence when making objections, which amounted to unsworn testimony. Specifically, the defendant argues that the following objection made by the prosecutor regarding defense counsel's question about whether the *Miranda* warning had been repeated to the defendant amounted to unsworn testimony: "Objection, Your Honor. First of all, they don't need to be repeated to him, and he's trying to create the impression that they do. They don't. That's it."

That statement does not constitute prosecutorial misconduct. Our cases indicate that improper unsworn testimony generally contains " 'the suggestion of secret knowledge' "; *State* v. *Santiago*, 269 Conn. 726, 751, 850 A.2d 199 (2004); on the part of the prosecutor. Here, the prosecutor's statement merely was an explanation of the ground for his objection and not an indication that he possessed secret knowledge of relevant facts. Although the proper course of action would be for the prosecutor simply to "state the grounds upon which [the] objection is made, succinctly and in such form as he or she desires it to go upon the record, before any discussion or argument is had . . . [a]rgument upon such objection . . . arising during the trial of a case shall not be made by either party unless the judicial authority requests it . . . ." Practice Book § 5-5. The statement at issue was not misconduct. It merely was a speaking objection, which, although disfavored under our rules of practice, does not constitute misconduct.

2

Second, the defendant argues that the prosecutor engaged in misconduct by improperly expressing his personal opinion regarding the credibility of the defendant and other witnesses. The defendant cites the following statements made during the state's closing argument and rebuttal: (1) "Stacy Rechenberg is no dummy. She's an intelligent woman. She knew what was happening. She knew they were about to rob that place." (2) "Who has an interest in this case to be untruthful? The defendant has an interest in this case to be untruthful." (3) "Ask yourself this? Who would have a motive to be untruthful? Stacy Rechenberg or this defendant, who faces significant consequences? Stacy Rechenberg, the innocent, alert worker at the credit union or this defendant, who can face severe consequences? I submit to you the answer there is obvious who would have a motive to be untruthful." (4)

"Who has the motive to be untruthful? Diane Jarvis or the man who had all the tools of the robbery with him and the intent to commit that robbery, and had taken action toward committing it?" (5) "He can't even get right the reasons he fled." (6) "Officer Gallagher has no criminal convictions. Stacy Rechenberg has no criminal convictions. Diane Jarvis has no criminal convictions. Danielle Gallagher had no criminal convictions. None of these people in this case have any criminal convictions except this defendant, and you can utilize that in evaluating [the] credibility of these witnesses."

As a general rule, prosecutors should not express their personal opinions about the guilt of the defendant, credibility of witnesses or evidence. *State* v. *Santiago*, supra, 269 Conn. 735. The statements about Rechenberg's knowledge, the defendant's confusion about why he fled and which witnesses had prior convictions were not misconduct. Those statements had an evidentiary basis. When the statements are examined in context, moreover, it is clear that the prosecutor was marshaling the evidence presented at trial.

The rest of the statements all asked the jury to determine, for a variety of reasons, whether a witness or the defendant was more credible. Our jurisprudence instructs that a prosecutor may comment on a witness' motivation to be truthful or to lie. *State* v. *Thompson*, 266 Conn. 440, 466, 832 A.2d 626 (2003). The prosecutor's statements regarding the witnesses' motives were, therefore, proper. Regarding the statements about the defendant's motive to lie, our Supreme Court has stated that "a prosecutor may point out that the possibility of incarceration may give a defendant a motive to lie . . . ." (Citation omitted.) *State* v. *Payne*, 260 Conn. 446, 460, 797 A.2d 1088 (2002). In *Payne*, the prosecutor stepped over the line of permissible rhetoric by telling the jury how much prison time the defendant would receive if he was convicted, which was an improper

expression of the prosecutor's personal opinion. Id., 460–61. Because that did not occur here, the prosecutor's statements about the defendant's motivation to lie did not constitute misconduct.

### 3

Third, the defendant argues that the prosecutor engaged in misconduct by improperly expressing his personal opinion regarding the defendant's guilt. The defendant cites the following statements made during the prosecutor's closing argument and rebuttal: (1) "The purpose of that is not to cash a check. The purpose of that, ladies and gentlemen—to use the vernacular—is to case the joint"; and (2) "There was no pressure. There was no coercion. There was no threat to have Marisa Bones arrested or have their child taken away. There was no threat of any of that. There was no requesting of a lawyer."

The first statement was not an expression of the prosecutor's personal opinion. The statement was a reasonable inference based on the evidence of what the defendant wore and how he acted during his initial visit to the credit union and the defendant's statement about the weak security there. We note that if the defendant's statement about the weak security had not been admitted into evidence, the prosecutor's statement would have been a personal conclusion rather than an inference. See generally State v. Santiago, supra, 269 Conn. 749 (conclusion, not linked to evidence, may be improper). The second statement was not an expression of personal opinion because when examined in context, it is clear that the prosecutor was marshaling the evidence. In the very next statement, the prosecutor qualified the challenged remark by stating, "Ladies and gentlemen, I submit to you none of that happened." That did not constitute a personal opinion.

4

Fourth, the defendant argues that the prosecutor engaged in misconduct by making improper comments intended to cause the jury to view defense counsel negatively. The defendant cites the following statement made during the state's rebuttal argument: "And on this whole issue of, you know, you didn't have enough time and this and that and blah, blah, blah; all that stuff that [defense counsel] was saying . . . ."

It is improper for a prosecutor to denigrate the function of defense counsel. See, e.g., *State* v. *Williams*, 81 Conn. App. 1, 16, 838 A.2d 214, cert. denied, 268 Conn. 904, 845 A.2d 409 (2004). "[T]he prosecutor is expected to refrain from impugning, directly or through implication, the integrity or institutional role of defense counsel. . . . It does not follow [however] that every use of rhetorical language or device is improper. . . . The occasional use of rhetorical devices is simply fair argument." (Internal quotation marks omitted.) Id. The prosecutor's statement, when examined in context, did not denigrate defense counsel. After making the challenged remark, the prosecutor focused on evidence that rebutted what defense counsel previously had argued. Although the use of "blah, blah, blah" was inartful, we have explained that we allow counsel leeway in closing arguments; *State* v. *Williams*, supra, 5; and that statement fell with the bounds of fair argument. As we stated in *State* v. *Dearborn*, supra, 82 Conn. App. 751, "[w]e are convinced that reasonable jurors are able to differentiate between lawyers' ripostes and actual evidence."

B

Having resolved that the prosecutor's statements were not improper, we need not address the *Williams* factors. There was no misconduct that could have denied the defendant his due process right to a fair trial.

The judgment is affirmed.

In this opinion the other judges concurred.